## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MASJID SADAR, INC. and SHAMEER PROPERTIES, LLC,<br><br><br>                              Plaintiffs,<br><br>     v.<br><br>BOROUGH OF SAYERVILLE, NEW JERSEY and BOROUGH OF SAYERVILLE, NEW JERSEY PLANNING BOARD,<br><br>                     Defendants. | Case No. 25-17831<br><br>**COMPLAINT** |

Plaintiffs MASJID SADAR, INC ("Masjid"), a domestic non-profit corporation, and SHAMEER PROPERTIES, LLC ("Shameer"), by its attorneys Storzer & Associates, P.C. and The Law Office of Lawrence B. Sachs, hereby complains of Defendants BOROUGH OF SAYERVILLE, NEW JERSEY ("Borough"), and BOROUGH OF SAYERVILLE, NEW JERSEY PLANNING BOARD ("Board") (collectively, the Borough and Board shall be referred to as "Defendants") as follows:

### LOCAL CIVIL RULE 10.1
### STATEMENT OF PARTY ADDRESSES

Masjid Sadar, Inc. has a business address of 216 Ernston Road, Parlin, New Jersey 08859.

Shameer Properties, LLC has a business address of 216 Ernston Road, Parlin, New Jersey 08859.

Defendant Borough has an address at 167 Main Street, Sayreville, New Jersey 08872. Defendant Board has an address at 167 Main Street, Sayreville, New Jersey 08872.

**INTRODUCTION**

1.      This action is commenced by Masjid Sadar, Inc. (the "Masjid") and Shameer Properties, LLC ("Shameer") to redress violations of their civil rights, as protected by the Free Exercise Clause of the First Amendment and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA"), caused by the Defendants' burdensome, discriminatory and unreasonable land use regulations and conduct that prohibit the Masjid from using real property to build a mosque on a parcel of land located in the Borough of Sayreville, New Jersey.

2.      The Masjid is an Islamic religious organization that has a leasehold interest in real property owned by Plaintiff Shameer, on which it seeks to build a house of worship where its congregants can practice their beliefs.

3.      The Masjid's agreement with Shameer includes an option to grant the property to the Masjid, conditioned on the property being approved for use and development as a house of worship.

4.      In order to use Plaintiffs' real property, located at 212, 214 and 216 Ernston Road, Parlin, New Jersey 08816 (the "Subject Property") as a House of Worship, the Plaintiffs applied for conditional use variances, design waivers, and preliminary and final site plan approval with the Board (the "PB Application").  The PB Application was denied by the Board following seven (7) hearings of testimony over a period of thirteen (13) months on June 4, 2025.

5.      Defendant Borough's land use regulations restricting religious institutions and Defendant Board's denial of the PB Application for conditional use and bulk variances

substantially burden the Masjid's religious exercise without being the least restrictive means of achieving any compelling governmental interest.

6.     Defendant Borough's land use regulations restricting religious institutions and Defendant Board's denial of the PB Application also discriminate against the Masjid and in favor of similarly situated religious and secular assembly and institutional uses.

7.     Defendant Board also discriminated against Plaintiffs on the basis of its Muslim religion and religious denomination by adopting local residents' hostility toward the Masjid and its use in an effort to thwart the Masjid from locating in the Borough.

8.     Plaintiffs seek declaratory and injunctive relief, as well as compensatory and punitive damages for the Defendants' willful violation of their civil and constitutional rights.

## PARTIES

9.     Plaintiff MASJID SADAR, INC. is a not-for-profit corporation formed under the laws of the State of New Jersey on April 5, 2021.

10.    Plaintiff SHAMEER PROPERTIES, LLC is a limited liability company formed under the laws of the State of New Jersey on August 25, 2008.

11.    Defendant BOROUGH OF SAYREVILLE, NEW JERSEY is a municipal corporation of the State of New Jersey, having offices at 167 Main Street in the Borough of Sayreville, New Jersey.

12.    Defendant BOROUGH OF SAYREVILLE, NEW JERSEY PLANNING BOARD is a municipal agency organized pursuant to N.J.S.A. 40:55D-69 having offices at 167 Main Street in the Borough of Sayreville, New Jersey.

13.    Each of the Defendants is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## JURISDICTION AND VENUE

14.    The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. §§ 2000cc, *et seq.*, and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Counts VII, VIII, and IX under 28 U.S.C. § 1367(a) for Plaintiffs' claims brought under New Jersey law as they arise from the same set of facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this district and the Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## FACTUAL ALLEGATIONS

### I.    The Masjid and Its Religious Exercise.

16.    The Masjid (which translates to Mosque in Arabic) is a Muslim religious organization and institution founded in 2021 with the mission to create a vibrant place to engage in traditional Islamic worship.

17.    In order to accommodate its religious exercise, the Masjid requires a mosque with adequate facilities to accommodate:

   a. A prayer area for personal prayers, regular services, holy day services, funerals, and other events;

   b. The Masjid's charitable efforts, which is religious exercise for congregants of the Masjid;

   c. Religious education for youth and adults, and for after-school religious and educational programs for its youth;

   d. Religiously ordained meals for congregants of the Masjid; and

   e. Its *imam* to have an office and counseling space.

4

18.     Due to the Defendants' laws and actions including denial of the Masjid's land use applications as described below, the Masjid does not have a mosque to engage in these practices and must modify its behavior as a result of inadequate facilities.

19.     The Masjid's congregants engage in *salat*, the practice of facing towards Mecca, and bowing down in prayer five times a day: dawn, noon, mid-afternoon, sunset and at night, and which is one of the core tenets of Islam.

20.     Plaintiffs believe that it is a religious requirement for its congregants to meet in congregation for *salat*.

21.     There are not currently any mosques within the Borough.

22.     The closest mosque to the Borough is in South River, New Jersey.

23.     There are approximately 2,500 Muslims and 800 Muslim families that live in and around Sayreville.

24.     Approximately 95% of the Masjid's congregants live in the Borough, and many walk to their daily prayers.

25.     In addition to *salat*, the primary day for Muslim worship is Friday, when Muslims attend a sermon and congregational prayer at the mosque--a practice that is required for men and encouraged for women and children if they are able.

26.     Plaintiffs believe that all Muslim men are obliged to assemble at a mosque for the *Jum'ah* afternoon prayer and sermon.

27.     Many of the Masjid's congregants are not able to leave work and drive to another town multiple times a day.

28.     Plaintiffs believe that the physical elements and consecrations of a mosque, including the following attributes, hold great religious significance.

29.     In order to be considered a mosque, the Masjid believes: (a) a facility must be a deeded property donated by the owner to God or owned and constructed by Muslims; (b) the prayer area must be specifically consecrated according to religious tenets; and (c) the sanctity of that prayer area must be maintained by adherence to certain religious practices and restrictions.

30.     Plaintiffs believe they are required by God to face the direction of the Holy Kaaba in Mecca, while offering prayers.

31.     To ensure congregants are able to comply with that command, one wall of the prayer hall in a mosque, the *qibla*, faces Mecca, and a decorative enclave, called a *miharb*, is displayed on that wall indicating the direction of Mecca.  Muslims orient themselves towards the *miharb* to ensure their prayers are consistent with their beliefs.

32.     The Imam will stand in front of the *qibla* when giving his sermon, ensuring the congregation is facing Mecca, while receiving the sermon.

33.     Due to the Defendants' laws and actions, the Masjid is forced to meet in alternative locations that do not meet any of the above requirements to be a mosque.

34.     The Defendants' laws and actions prevent many of Sayreville's Muslims from fulfilling their religious obligation that daily prayers should be performed in a mosque with fellow Muslims.

35.     Due to the importance of *Jum'ah*, combined with the Masjid's limited space, the Masjid holds two prayer services on Friday afternoons.

36.     The first, busier Friday prayer service occurs from 1:00pm to 1:20pm.

37.     The second Friday prayer service occurs from 1:50pm to 2:10pm.

38.     The Masjid's religious beliefs require separate prayer spaces for men and women.

6

39.     Due to the Defendants' laws and actions, the Masjid is forced to currently meet at a location that does not have separate space for men and women.

40.     The Masjid also requires spaces where men and women, respectively, can perform *wudu*, a required part of all prayers.

41.     *Wudu* is a sacred purification ritual that involves washing specified body parts in a prescribed manner.  In Islam, a person whose *wudu* is not valid cannot be said to have prayed.

42.     There is no location in the Borough where the Masjid can assemble that has an area where *wudu* can be performed, making it impossible at times for congregants of the Masjid to exercise their religious practice.

43.     Plaintiffs also believe that the sharing of food brings blessings on both the giver and the receiver.  As such, the Masjid believes that its mosque should contain facilities for preparing and serving food.

44.     During the month of Ramadan, Muslims fast until sundown and then come together as a group for *iftar,* the fast-breaking evening meal, thus requiring kitchen facilities.

45.     The Masjid does not currently have kitchen facilities where its congregation can meet for communal meals.

46.     The Masjid also believes that it has a religious duty to care for the elderly and intends to provide lunches for older members of their community consistent with that belief.

47.     The Masjid does not currently have a place where the elderly can regularly congregate and be shown reverence consistent with Islamic belief.

48.     The Masjid also believes that its congregants must participate in the observation of sacred major life events such as birth, marriage and death.

49.    These include weddings, *aqiqah*, in which members of the congregation share food and give thanks for the blessing of a new child, and *ghusl*, which is purification of a body when someone dies.

50.    Due to the Defendants' laws and actions, the Masjid does not have facilities to perform such life event ceremonies in.

51.    Plaintiffs also believe that children are a critical part of their community, and that it is important for children to have a strong understanding of their Muslim identity.

52.    As such, the Masjid believes that it must provide a safe Islamic atmosphere where children and teens can embrace their Islamic identity together with other youth.

53.    Consistent with mainstream Islam, the Masjid believes that every letter of the Qu'ran is sacred and every word spoken from the Qu'ran is a blessing.

54.    The Masjid begins teaching children to say blessings in Arabic starting at age 5, and teaches them to understand Arabic a few years later.

55.    The Masjid believes the more exposure children have to both Arabic and the Qu'ran at a young age, the more blessings they will experience in life.

56.    The Masjid also provides adult religious education which also is separated between men and women.

57.    As children learn to understand the Qu'ran they begin *hifdh*, which is a practice dedicated to memorizing the Qu'ran.

58.    *Hifdh* is sacred to Muslims and is understood to preserve the Quran in the hearts and minds of Muslims, independent of paper copies.

59.    The Masjid believes that any parent whose child completes *hifdh* will wear a crown of light on the day of reckoning and will receive blessings in the afterlife.

60.    The Masjid also believes it is religiously important to teach children Islamic studies, which would include the sayings of the Prophet Muhammed, prayers, what is considered lawful and prohibited in Islam, as well as rights and duties as the citizen of a country.

61.    Due to the Defendants' laws and actions, the Masjid currently lacks any space for youth education.

62.    But for the Defendants' laws and actions, the Masjid would be teaching Islamic studies classes one day each weekend as part of a weekend school for children, hosting evening classes for different age groups, including college students, and offering adult study, both for parents who bring their children to the weekend school, and more in-depth instruction during the week.

63.    Currently, the Masjid has to rely on the hospitality of private facilities and individuals for religious study.

64.    The alternative spaces the Masjid currently uses do not have adequate facilities to provide religious education.

### A.    The Masjid's Property

65.    Subject Property is located as 212, 214, & 216 Ernston Rd. Parlin, New Jersey 08816, identified on the tax map of the Borough as Block 444.04, Lot 23, 24, 25 and 28, ("Subject Property").

66.    Plaintiff Shameer purchased real property known as 214 Ernston Road on or about September 12, 2018.

67.    Plaintiff Shameer purchased real property known as 212 Ernston Road on or about July 16, 2019.

68.    Plaintiff Shameer purchased real property known as 216 Ernston Road on or about May 19, 2021.

69.    Plaintiff Shameer remains the owner of record of the Subject Property.

70.    Plaintiff Masjid has a leasehold interest in the property.

71.    The Subject Property is located in the "R-7" zoning district of the Borough.

72.    The Subject Property is approximately 2.49 acres in size.

73.    The Subject Property fronts on Ernston Road.

74.    Also located within a quarter mile on Ernston Road from the Subject Property is the Scoliosis Technologies Medical center, three dental offices, an Orthodontics office, and a law office.

75.    The Subject Property is within half a mile of Garden Friends daycare center; a paving company, the Samsel Upper Elementary School (which also houses the Sayreville Board of Education), and The Gateway Shopping Center, which contains nineteen chain and locally owned businesses including restaurants, retail, and beauty salons.

76.    Madison Park Elementary School and Messiah Lutheran Church (0.7 mile away), Sayreville Kennedy Park (0.8 mile away), Sayreville War Memorial High (0.9 mile away) and a Walmart store (1 mile away) are all within a mile of Subject Property.

77.    The Subject Property contains two two-and-a-half story single-family dwellings with garages, and one two-and-a-half story structure that was previously a single-family dwelling with an attached garage.

78.    In 1967, the Borough granted a variance for a portion of the Subject Property, Lot 23, to be used as a combination office and residential property, and to build a paved parking lot on the property with 26 parking spaces.

79.     In 1992, the Borough again granted a variance for Lot 23 to be used as an attorney's office.

### B. The Borough's Land Use Regulations Imposed on the Masjid's Use of Its Property

80.     The use of the Subject Property is subject to the laws and regulations of the Borough.

81.     The Borough regulates land use within its jurisdiction through the Borough of Sayreville Code of Ordinances ("Code").

82.     The Code is a "land use regulation" within the meaning of 42 U.S.C. § 2000cc-5(5).

83.     Section 26-4 of the Code provides: "[T]he establishment of any use not expressly permitted by this chapter shall be prohibited."

84.     A mosque is a "house of worship" within the meaning of the Code.

85.     Pursuant to the Code, a house of worship must first obtain a "conditional use" permit to locate anywhere within the Borough.

86.     Section 26-85 of the Code establishes ten (10) criteria for the conditional use of a house of worship in all zoning districts for the Borough, which are:

1)     Minimum lot area: one acre

2)     Minimum Lot width: 100 feet

3)     Minimum Lot depth: 100 feet

4)     Minimum front yard setback: 50 feet

5)     Minimum one Side yard/total setback: 25/50 feet

6)     Rear yard setback: 50 feet

7)     Maximum height: 40 feet

8) Maximum stories: 3

9) Maximum lot coverage for buildings: 25 percent.

10) Maximum lot coverage for buildings and pavement: 45 percent.

87. Section 26-85 of the Code further provides that houses of worship must provide screening and landscaping "where necessary to minimize the development's impact on adjacent properties."

88. Section 26-88 of Code titled "Off-street Parking and Loading" sets forth requirements for off-street parking for all uses in the Code.

89. Section 26-88.1 of the Code ("*Minimum Required Off-Street Parking Schedule for Non-Residential Uses*") provides: "The number of off-street parking spaces required for any non-residential use shall be determined by reference to Parking Schedule I below."

90. Under the Code's Parking Schedule I, the number of parking spaces required for houses of worship are "1 for each 3 seats. Where the specific amount of seating is undetermined, then 1 parking space shall be required for each 250 square feet of assemblage area." Code § 26-88.1.

91. Certain other Code provisions, relevant to the Masjid's land use application as described below, include:

a. Code § 26-89: Requires all signs to be setback at least half of the minimum required set back, or 25 feet for a House of Worship in zoning district R-7.

b. Code § 26-82.6(a)(3): Prohibits an accessory structure within 10 feet of the main building.

c. Code § 26-96.1(e): Prohibits flat roofs in residential areas.

12

    d.    Code § 26-88: Requires a 12 foot by 50 foot loading area for any building over 25,000 square feet.

    e.    Code § 26-98.3(f): Requires a declaration lane for traffic turning into any development providing 100 or more parking spaces.

    f.    Code § 26-99.6D(e): Requires all lawn and landscaped areas to be graded to provide a minimum slope of two (2%) percent.

    g.    Code § 26-98.1(8)(b)(8): Prohibits parking spaces located within the front yard setback.

    h.    Code § 26-98.1(6): Requires sidewalks between parking areas and principal structures.

    i.    Code § 26-98.1(5): Requires curbing and planted islands within the parking area.

### C.    The Borough Seeks to Prevent the Masjid from Using Its Property for Religious Worship

92.    In September of 2021, the Masjid's congregants began meeting in the former law office on the Subject Property to pray and engage in other Islamic acts of worship.

93.    Approximately 60 people attended the first gathering of the Masjid.

94.    Attendance doubled within weeks of the first gathering, as local Muslims learned there was now a place in the Borough where they could pray as a congregation.

95.    In an effort to allow the congregation to interact outside the prayer room, the Masjid erected tents behind the existing building on the Subject Property.

96.    Shortly after the tents were erected, Kirk Miick ("Miick"), an official from the Borough's Construction Department, inspected the Subject Property.

97.     Miick told the principal of Shameer that he "had no issue" with the Masjid meeting on the Subject Property but would have to issue a citation for the construction of the tents.

98.     On or about September 23, 2021, Miick issued a Notice and Order of Penalty, which included a Stop Construction Order and penalty of $112,000.

99.     The next day, on September 24, the Borough's Zoning Officer wrote Shameer a letter referring to the single inspection at the Subject Property and informing Shameer that it was required to obtain permits for construction – again without citing any Code sections – as well as a "Use Variance" and "Site Plan" submission.

100.    On or about September 29, 2021, four business days after the initial inspection, Stop Construction Order, and only three business days after the  initial letter from the Borough, the Borough filed a complaint against the principal of Shameer.

101.    The Complaint cited Code Section 26-114(a), which provides:

> No land shall be occupied or used, in whole or in part, for any purpose, no use of any land, building or structure shall be changed and no building or structure shall be erected, altered or used for any purpose whatsoever unless and until a zoning permit for said use shall have been issued by the Zoning Officer.

102.    The principal of Shameer admitted liability to building without a permit and paid a reduced fine.

103.    Three business days later, on or about November 2, 2021, Miick again issued a Notice and Order of Penalty including a Stop Construction Order and penalty for $692,000.00.

104.    Upon information and belief, prior to November 2, 2021, Miick and other representatives of the Borough were fully aware that the tents had been erected and the Subject Property was being used as a Masjid.

105.    Representatives of the Borough again told Masjid and Shameer that the Subject Property could continue to be used as a place of worship while they prepared their zoning application.

### D.    The Masjid Submitted Its First Application to Alleviate Severe Burdens on Its Religious Exercise

106.    On or about February 19, 2022, the Masjid filed its application for Conditional Use and Preliminary and Final Major Site Plan (the "ZBA Application") with the Borough of Sayreville Zoning Board of Adjustment ("ZBA").

107.    The ZBA Application included materials to fulfill all of the applicable provisions of the Borough's 31-point application checklist, including sealed plans, a survey, a map, preliminary evaluations and other materials.

108.    The ZBA Application proposed demolishing the existing residential structures on the Subject Property and constructing a 36,552-square foot mosque with related improvements.

109.    The proposed mosque would permit the Masjid to engage in the religious exercise described above.

110.    The proposed mosque would have two men's prayer halls and one women's prayer hall along with appropriate facilities for *wudu*.

111.    It would also include five classrooms for religious instruction and space for needed youth programming.

112.    The proposed mosque would also have a kitchen and activity hall.

113.    The proposed mosque would include a freestanding minaret, although the mosque would not use the minaret for a call to prayer.

114.    The ZBA Application proposed to have 83.33% of the lot covered by impervious surface.

115. The buffer proposed in the ZBA Application was as little as 1.73 feet at some points.

116. The ZBA Application sought "D(3)" Conditional Use Variances for:

    1) non-compliance with rear yard setback and impervious lot coverage requirements;

    2) Insufficient landscape buffer (Code § 26-82.10)

117. The ZBA Application required design waivers/exceptions for:

    1) Structures and parking within required buffer area (Code § 26-96.6);

    2) Insufficient accessory structure setback from Principle Building (Code § 26-82.6.3);

    3) Excessive accessory structure floor area (Code § 26-82.6.6); and

    4) Insufficient On-Site Landscaping, 17% of the lot being landscaped when a minimum of 20% is required (Code § 26-96.7.a);

    5) Insufficient Landscaping within the parking lot, 1.9% of the parking area landscaped when 10% is required (Code § 26-98.i);

    6) The required Hairpin Striping not provided (Code § 26-98.1.b.1);

    7) The required sidewalks not provided (Code § 26-98.1.b.6);

    8) Parking in the front yard setback and within 5 feet of the property line (Code § 26-98.1.b.8); and

    9) None of the required trees along the property frontage (Code § 26-97.2.c).

118. On or about March 18, 2022, the Borough Engineer notified the Masjid's attorney that the Borough would require some items the Masjid had either requested a waiver for or had deemed not required when it filed the ZBA Application.

119. The Borough Engineer also indicated that all items that the Borough's checklist indicated "the Board may require" would be required in order for the ZBA Application to be deemed complete.

120.    The Borough Engineer also provided the Masjid with an initial Technical Engineering Report on the ZBA Application.

121.    Shameer and representatives of the Masjid including their engineer, Adnan Khan ("Khan"), met with the Borough's Technical Review Committee ("TRC") on March 23, 2022.

122.    Pursuant to Code § 26-10.5, the Borough's Planner and Engineer sit on the TRC.

123.    At the March 23, 2022 meeting, Plaintiffs confirmed that both a wetlands assessment and a preliminary traffic study had been completed.

124.    During the March 23, 2022, meeting, the TRC inquired whether Middlesex County would require a right-of-way ("ROW") easement or expansion of Ernston Road.

125.    The TRC and the Plaintiffs' representatives agreed that if a ROW was required it could significantly impact the existing site plan.

126.    Khan promptly contacted Middlesex County to inquire about a ROW easement.

127.    Further revisions to the plans were paused until Middlesex County provided a response.

128.    On or about September 19, 2022, Plaintiffs and their professionals met with the TRC again but were unable to move forward with any planning revisions as they had not received a decision from Middlesex County related to the ROW.

129.    On or about September 20, 2022, Khan once again reached out to Middlesex County, asking for clarity on the ROW easement.

130.    Khan and representatives of Plaintiffs met with the Middlesex County Development Review Committee ("DRC") on or about October 25, 2022 to discuss the application.

131.    On or about November 17, 2022, Middlesex County's Senior Engineer informed Khan that the DRC did not require any additional traffic information and would approve Plaintiffs' proposal to build two driveways, conditional on Plaintiffs submitting revised plans with slightly expanded driveways.

132.    Throughout this time period, the Masjid diligently pursued its ZBA application and made revisions to the same in an attempt to address any concerns of the ZBA and to obtain an approval for its house of worship.

### E.    The Borough Files Suit Against the Masjid in State Court

133.    Within days of the County Engineer determining that Plaintiffs' application could move forward without any changes to Ernston Road, on or about November 18, 2022, Miick once again issued a Notice and Order of Penalty including a Stop Construction Order and a penalty of $2,000.00.

134.    This Notice and Order of Penalty was issued despite no additional construction being undertaken at the Subject Property.

135.    Less than a month later, on or about December 6, 2022, the Borough filed a Complaint in the Superior Court of New Jersey, Middlesex County, against Shameer and Mr. Mohamed Shameer Sadar, the managing member of Shameer, captioned *Borough of Sayreville v. Mohamed Shameer Sadar and Shameer Properties, LLC*, No. MID-L-006032-22, (N.J. Super., December 6, 2022) (the "State Action").

136.    The Borough Engineer later admitted (in a report issued February 21, 2024) that the use of the property as a house of worship "resulted in complaints being filed with the Borough from surrounding residential properties. Based upon these complaints violation notices were

18

issued by the Borough. As a result of the violation notices issued by the Borough this matter [entered] litigation."

137.    The Complaint sought, among other relief, to enjoin Shameer and Mr. Sadar from using the Subject Property as a Mosque until a variance was obtained to permit the use.

138.    The Complaint avers that Shameer had been using the Subject Property and in so doing has "created a public health risk," but did not include the fact that the Borough had permitted the use for at least a year notwithstanding any unspecified health "risk," nor does the Complaint specify any actual harm as a result of the use.

139.    The Complaint instead focuses on a failure to provide fees to the Borough related to the transfer of the property (Count I) and the purported $690,000.00 in fines, continued presence of unpermitted tents, and continued use of Subject Property as a house of worship (Count II).

140.    On or about February 2, 2023, Shameer and Mr. Sadar filed their Answer in the State Action.

141.    On or about February 7, 2023, the Court entered an Order, *inter alia*, enjoining Shameer and Mr. Sadar from operating a house of worship on the Subject Property.

142.    The Borough's attorney opined in the news media on the ZBA Application, describing it as "grossly inadequate" and admitting that the Masjid had operated throughout 2022 on the Subject Property with the Borough's full knowledge and understanding.

143.    On or about February 4, 2025, the Complaint in the State Action was dismissed by consent.

144.    The restraint on using Subject Property as a house of worship was ordered to remain in full force and effect "until further Order of the Court."

145.    The State Action was filed despite ongoing dialogue and cooperation on the part of the Plaintiffs to build a house of worship in accordance with the Borough Code.

### F.    *The Masjid Has Been Forced to Use Inadequate Facilities.*

146.    In February 2023, after the Order in the State action was issued, the Masjid ceased use of Subject Property as a mosque.

147.    In February 2023, the Masjid began meeting in the gymnasium of the St. Bernadette Church located at 20 Villanova Road, Parlin, New Jersey 08859.

148.    The St. Bernadette Church is not a mosque and can never be considered a mosque by the Masjid.

149.    The St. Bernadette Church was constructed and consecrated according to Christian tradition and not according to the religious tenets held sacred by the congregants of the Masjid.

150.    The St. Bernadette Church lacks appropriate facilities for *wudu*.

151.    The St. Bernadette Church does not adequately accommodate the separation of men and women at prayer services.

152.    The St. Bernadette Church is not oriented toward Mecca, and lacks a dome and a minaret.

153.    The St. Bernadette Church also lacks the religious, cultural and social experience of a mosque.

154.    The church notified the Masjid that its gymnasium would no longer be available in the summer of 2023.

155.    The Masjid ceased using the St. Bernadette Church and moved all programming to a rented fire hall located at 3011 Cheesequake Road, Parlin, New Jersey 08859.

156.    The Masjid has been using the fire hall since that time.

20

157.    The fire hall is grossly inadequate for the Masjid's religious exercise.

158.    The Masjid and its congregants are unable to comply with their religious beliefs by holding Friday prayer services in a building that is not a mosque.

159.    The fire hall is not a mosque and can never be considered a mosque.

160.    The fire hall is not oriented toward Mecca, and lacks a dome and a minaret.

161.    The fire hall also lacks the religious, cultural and social experience of a mosque.

162.    The fire hall lacks appropriate facilities for *wudu*.

163.    The fire hall space does not adequately accommodate the separation of men and women at prayer services.

164.    Attendees of the Masjid with small children are prevented from attending prayer services because there are no facilities such as a separate area for infants and younger children.

165.    Various other limitations on the Masjid's religious exercise, as described above, are also applicable to the Masjid's use of the fire hall.

### G.    *Plaintiffs Continue to Work Towards a Solution*

166.    Following the filing of the State Action, the Masjid continued to work with ZBA professionals to revise the  ZBA Application.

167.    On or about February 3, 2023, Khan sent a letter to Borough's Engineer to update the Borough on the status of each item noted in the March 18, 2022 Technical Engineering Review with respect to the ZBA application.

168.    The letter confirmed that, in accordance with the March 18, 2022 Review, Plaintiffs had provided: (a) a copy of a property survey; (b) an Environmental Impact Study; (c) a Parking Analysis Table; (d) preliminary earthwork calculations; (e) details for any proposed signs; (f) a traffic report; (g) underground piping plans; (h) a sanitary sewer design report; (i) a wetlands

assessment; (j) drainage structure calculations; (k) an executed Major Development Stormwater Summary; (l) a Soil Erosion and Sediment Control Plan; (m) a tree inventory; (n) a lighting plan; and (o) a landscaping plan.

169.    Khan also confirmed that plans have been revised to be in compliance with the Engineer Review as it pertained to: rear and side setback; the amount of impervious lot coverage; grading of landscape and parking; underground piping; fire hydrant and tree placement; and lighting.

170.    On or about March 20, 2023, Borough's Engineer issued an updated completeness report ("March 2023 report") that inaccurately listed several "deficiencies," including:

1)    A revised Environmental Impact Study that included anticipated noise impacts;

2)    An additional Sanitary Sewer Design Report that monitors sewage flows downstream from the Property;

3)    A new storm water filter with NJDEP certification;

4)    A revised Stormwater Report with an updated Major Development Stormwater Summary Form; and

5)    A revised Soil Erosion and Sediment Plan to include a note in inlet protection.

171.    On or about June 13, 2023, Khan replied to the March 2023 Report, observing:

1)    The provided Environmental Impact Statement already contained the noise estimations requested in the March 2023 report;

2)    It is the jurisdiction of the utility authority, not the applicant nor the TRC, to determine if the existing sewage main and piping has the capacity to serve the proposed project;

3)    The proposed water filter is NJDEP certified and satisfies the requirements of the Code;

4)    The impervious area and in inflow area numbers referenced by the Borough Engineer in the March 2023 report do not reflect what was presented in the updated plans;

5) The Soil Erosion and Sediment Control Plan already had an inlet protection note as requested in the March 2023 report; and

6) All other requested adjustments and additions had been made as requested.

172.    On June 7, 2023, the Principal Planner for Middlesex County confirmed that the County would not require widening of Ernston Rd. or a ROW easement.

173.    The updated plans submitted to TRC based on Planner and Engineer response no longer required landscaping variances, and now only require bulk waivers.

174.    At the suggestion of Borough staff, the application was moved to the Planning Board instead of the ZBA.

### H.  The Masjid Submitted Its Application to the Planning Board to Alleviate Severe Burdens on Its Religious Exercise

175.    On or about August 13, 2023, Plaintiffs submitted an Application for fully conforming Conditional Use approval, bulk variances, preliminary and final site plan approval, and design waivers with respect to the Subject Property ("PB Application").

176.    The application was fully compliant with the Conditional Use standards under Code § 26-85(b)(2).

177.    The PB Application sought to demolish the existing structures on the Subject Property, and build a three (3) story, 25,363-square foot House of Worship, reduced from the 36,552-square foot House of Worship proposed in the ZBA application.

178.    The PB Application also included five classrooms for religious instruction and space for needed youth programming.

179.    The PB Application was scaled back significantly from the ZBA Application and satisfied the building coverage and impervious coverage requirements in the Code.

180.    The PB Application proposed 109 parking spaces, reduced from the 152 spaces in the ZBA application.

181.    A sixty-four (64) vehicle parking area was proposed beneath the main building with a forty-five (45) space parking lot proposed in front of the main building.

182.    The mosque's prayer halls would have a maximum capacity of 973 congregants.

183.    The PB Application requested the following bulk variances pursuant to N.J.S.A. 40:55D-70(c):

a.    Code § 26-88.1 required 113 parking spaces based on square footage of the building, and the PB Application initially proposed 109;

b.    Code § 26-98.1(8)(b)(8) required that parking spaces not be built within the front yard setback, and the PB Application proposed multiple spaces within the front yard setback;

c.    Code § 26-84.1(b)(13) required all signage to be at least half way back from the minimum front yard setback or half of 50 feet, and the PB Application proposed to have a monument sign 12.5 feet from the road;

d.    Code § 26-82.6(a)(3) required an accessory structure be a minimum of 10 feet from the main building, and the PB Application proposed to build the minaret 7.14 feet from the main building; and

e.    Code § 26-96.1(e) required buildings in residential areas to not have flat roofs; and the PB Application proposed the Mosque roof to be flat.

184.    In order for Plaintiffs to obtain relief for variance relief from N.J.S.A. § 40:55D-70(c)(2), Plaintiffs were required to show that the foregoing variances pursuant to N.J.S.A. § 40:55D-70(c)(2) are not substantially detrimental to the public good and that the benefits will substantially outweigh any detriments; and that the Master Plan and the Zoning Code are not impaired by the grant of the variances pursuant to N.J.S.A. § 40:55D-70(c)(2).

185.    For Preliminary and Final Site Plan approval, an applicant must demonstrate that other than the variances, the technical requirements of the Zoning Code have been met.

186.    The PB Application also requested design waivers for the following:

a.    Code § 26-88 required a 12 foot by 50 foot loading area for any building over 25,000 square feet, and the PB application did not include a loading area.

b.    Code § 26-98.3(f) required a deceleration lane for traffic turning into any development providing 100 or more parking spaces, and the PB Application did not include a deceleration lane.

c.    Code § 26-99.6D(e) required all lawn and landscaped areas to be graded to provide a minimum slope of two (2%) percent, and the PB Application proposed flat landscape;

d.    Code § 26-98.1(6) required sidewalks between parking areas and principal structures, and the PB Application did not include sidewalks; and

e.    Code § 26-98.1(5) required curbing and planted islands within the parking area, and the PB Application proposed head-to-head parking.

187.    Relief from a Design and Performance Standard in the Code requires a "waiver."

188.    The legal standard for a "waiver" is set forth in N.J.S.A. 40:55D-51(b), which provides:

> The planning board when acting upon applications for preliminary site plan approval shall have the power to grant such exceptions from the requirements for site plan approval as may be reasonable and within the general purpose and intent of the provisions for site plan review and approval of an ordinance adopted pursuant to this article, if the literal enforcement of one or more provisions of the ordinance is impracticable or will exact undue hardship because of peculiar conditions pertaining to the land in question.

189.    From inception, review and consideration of the PB Application was wrought with improper treatment and demands, inaccurate statements, and various irregularities that demonstrated hostility toward the Plaintiffs' proposed mosque, including significant delay of the processing of the PB Application.

190.    The Borough Engineer issued a Technical Engineering Review of the PB Application on September 22, 2023.

191.    The September 22, 2023 report denied that Plaintiffs had submitted an EIS that addressed noise concerns and claimed that one was still required, even though Plaintiffs had submitted one to the PB on February 3, 2023.

192.    The September 22, 2023 report claimed that the proposed water filtration system was not NJDEP certified, even though it was certified as had been communicated to the PB by Plaintiffs' engineer.

193.    The September 22, 2023 report stated "the required parking" for a house of worship "can only be calculated on square feet of assemblage area if the specific amount of seating is undetermined."

194.    The Borough Engineer referred to the maximum capacity of the prayer halls (971) as the "specific amount of persons (973) that require seating," and determined "the parking requirement shall be 1 space for each three (3) seats" despite there being no seats in any of the prayer halls, and despite there being no legal or logical relationship between the "maximum capacity" of the structure and the number of seats provided.

195.    It was not until five months later that the PB Application was finally deemed complete on January 3, 2024.

196.    On or about February 16, 2024, the Board Planner issued a report based on the PB Application noting routine concerns of any application relating to traffic, landscaping, lighting and refuse.

197.    On or about February 21, 2024, the Board Engineer issued yet another report based on the PB Application.

198.    The Borough Engineer's report falsely represented that "[t]he subject application is before the Board as a result of ongoing litigation with the Borough concerning the conversion of the previous uses on the property to a House of Worship."

199.    Despite being provided evidence to the contrary, in the report, the Board Engineer again erroneously stated that the proposed water filter was not NJDEP certified and did not meet the requirements of the Code.

200.    The Board engineer, again relying on maximum occupancy calculations, rather than the total area of the building, concluded that a total of *377* off-street parking spaces were required.

201.    This figure grossly overestimated the number of parking spaces requires, was not in conformity with the applicable ordinance provision, and treated the Masjid in a discriminatory manner.

202.    The Borough Engineer concluded "[t]he Traffic Report should be revised to address the 268 space parking deficiency."

203.    Failing to deem the PB Application complete in a timely fashion together with the Defendants' professionals raising issues that had already been addressed or resolved only served to further delay consideration of the PB Application by the Board.

**I.    *The Planning Board Held Eight Hearings on the PB Application, Which Were Characterized By Procedural and Substantive Deviations From the Usual***

27

*Procedure*

204.    The Board held hearings on the PB Application on eight (8) occasions: April 3, May 1, July 17, September 18, and October 16, 2024: April 16, May 7 and June 4, 2025.

205.    Upon information and belief, no other application has been the subject of more than seven hearings before this Board during the last five years.

206.    On January 17, 2024, the Board held a regularly scheduled hearing at which the PB Application was not on the agenda.

207.    Even though the PB Application was not the subject of that hearing, a Borough resident spoke as to "the Mosque that operated illegally," across from his house.

208.    The resident stated: "We have a lot of us in the town that are opposed to this."

209.    The resident wanted to make sure the Board would "see how all the residents would be affected if this… *thing*… is approved."

210.    The resident acknowledged that an application for the Masjid had also been submitted to Middlesex County and asked "if Middlesex approves that on their own, can you guys deny that?"

211.    Even though the PB Application was again not on the agenda, on March 6, 2024 a request was made to the Board by members of the public that the Board hire a RLUIPA Attorney "for the Ernston Rd. House of Worship."

212.    On March 20, 2024 the Board met again and once again the PB Application was not on the agenda.

213.    When the public portion opened, counsel for the Board reminded the public that the Board cannot hear questions related to any specific application that has an upcoming hearing.

214.    Despite this admonishment, a resident:

28

1) reiterated the request for a RLUIPA Attorney "for the Earnston Rd. House of Worship," arguing that it would be "helpful" to have a Religious Land use expert to "advise and help preserve as much quality of life for the surrounding property, and all of Sayerville;" and

2) Requested an "independent study be performed for traffic, environment, noise, light and other impacts."

215.    Chairman Tighe responded to the resident saying the Board is "in the process of looking into hiring the attorneys and the traffic study."

216.    Chairman Tighe acknowledged that (Borough) "Council has given us the ok."

217.    Board member Bolton stated it was his "understanding that there are funds in place for, to assist with a legal counsel, RLUIPA, but uh… if there's a traffic engineer, escrow fees posted by the applicant would be utilized to finance that expert."

218.    Despite the representations made to the public, funds were taken out of the escrow for the PB Application for both the RLUIPA attorney and Board retained traffic engineer.

219.    This resulted in the Plaintiffs incurring unnecessary and significant expense for two professionals for the Board.

220.    The Board then went into executive session.

221.    At the March 20, 2024 executive session, the Board voted to hire a RLUIPA attorney and a traffic engineer to assist with the review of the PB Application.

222.    Upon information and belief, the Board has never retained a RLUIPA attorney other than for this PB Application.

223.    The Board retained the RLUIPA attorney in direct response to being requested to do so by the public.

224.    Both of these retentions were not the customary practice with respect to other applications considered by the Board.

225.    The hearing was scheduled to start at 7:30 p.m. on April 3, 2024; however, the meeting didn't start until 7:55 p.m. due to the number of people present for the PB Application, which was the only application on the agenda.

226.    The subsequent hearings on the PB Application were held at the Adult Activity Center at 432 Main Street in Sayreville due to the need to accommodate the large crowd attending the hearings.

227.    Upon information and belief, the majority of the large crowds were objectors to the PB Application.

228.    All Planning Board Meetings held during this time that did not consider the PB Application were held at Borough Hall.

229.    The conducting of hearings on the PB Application at an alternative site to accommodate the large crowds was not something normally undertaken by the Board and had not been done in the past three (3) years.

230.    N.J.S.A. § 40:55D-53.2 provides: "The municipality or approving authority shall not bill the applicant, or charge any escrow account . . . for any . . . meeting room charges."

231.    Contrary to that statute, both the costs of renting the Adult Activity Center and recording of hearings at that location were taken out of the Masjid's escrow funds.

232.    These digressions from the normal Board process of rental of an alternative location for the hearings on the PB Application and corresponding additional recording charges that the Masjid had to pay were in direct response to the public opposition to the PB Application, the majority of which was hostile to the Masjid's use.

### J.    The "Parking" Issue Dominates the Hearings.

233.    Over the course of the next year, the issue of parking for the Masjid and the discriminatory application of off-street parking requirements against the Masjid, driven by resident and Board hostility, dominated the PB Application hearings.

234.    At the hearing on May 1, 2024, the Masjid's Traffic Engineer, William Stimmel, explained that he calculated the required number of parking spaces for the Masjid's place of worship, based on one parking space per 250 square feet of assemblage area, to be 113 spaces.

235.    As the Masjid was proposing 109 spaces, it required the parking variance of 4 spaces pursuant to § 26-88 of the Code.

236.    Mr. Stimmel testified that the only time more than 100 cars were witnessed on Subject Property was on a holiday.

237.    The Masjid then reminded the Board that it would agree to a condition of approval that major holidays would not be celebrated at Subject Property.

238.    The Masjid would continue to celebrate holidays at larger venues as it had been doing since the Court enjoined it from using Subject Property.

239.    Despite offering these conditions, the Masjid engaged in several months of revising its plans to satisfy the Board's demands related to parking.

240.    Vice-Chair Muller and Member Allegre both questioned Stimmel's calculation of 113 parking spaces needed, pointing to the engineering report which had concluded that 377 spaces would be needed based on the capacity of the prayer hall *and* the total area of the building.

241.    Vice-Chair Muller later asked about the site plan which showed 324 parking spaces needed based on the capacity of the prayer rooms being 973, and asked how it was down to 113.

242.    The Masjid clarified that "973 seats" in the prayer halls was not a reference to actual seats but an estimate of the maximum occupancy of the three rooms, but the 113 number was more accurate since there were no seats in the prayer hall.

243.    The Board pressed on why the parking shouldn't be based upon the occupancy of the prayer hall, to which Simmel read from the Code "'Where the specific  amount of seating is undetermined' -- it's undetermined -- 'then one parking space shall be required for each 250 square feet.'"

244.    After the May 1, 2024 hearing, the Masjid decided to revise the plans and reduce the capacity of the prayer halls, in response to the Board's persistent questions about the prayer hall capacity.

245.    On July 17, 2024, Architect Joseph Javier testified before the Board on behalf of the Masjid.

246.    Mr. Javier testified that the Masjid now proposed installing lifts in the parking garage, increasing the off-street parking capacity by 57 spaces, bringing the total number of parking spaces to 166.

247.    Mr. Javier testified that one prayer room had been eliminated, and converted into classrooms and space for youth activities.

248.    The remaining prayer halls had a reduced capacity of 340 in the men's prayer hall and 114 in the women's prayer hall for a total capacity of 454 persons.

249.    Based on the Code's 1 per 3 seat requirement, the revised plans resulted in a parking requirement of 151 spaces.

250.    The lift system brought the Masjid's parking capacity to 166, satisfying the Code and eliminating the need for a parking variance.

251.    Despite the Masjid meeting the off-street parking requirement standards actually stated in the Code as described above, at the following hearing on September 18, 2024, Counsel for the Board incorrectly stated "I just want to clarify that from the board's perspective, there is no parking surplus."

252.    At the October 16, 2024 hearing, Mr. Stimmel testified that, given the 454 persons permitted in the prayer area, the most parking spaces required by the Code would be 151.

253.    Mr. Stimmel testified that with respect to a traffic study that had been performed at the fire hall on a Friday afternoon in 2022 for two separate services, only 194 total vehicles entered the Subject Property in over four hours for both services combined.

254.    Vice-Chair Muller asked Mr. Stimmel "That analysis you gave is based on the assumption that you only need 196 parking spaces, correct?"

255.    Mr. Muller followed up by asking "did you do an analysis of what your opinion would be [of the traffic impact] if the parking deficiency were 211 spaces?"

256.    Mr. Stimmel reiterated that, even taking the maximum number of cars observed during the busiest hour on the busiest day of the week, and even assuming "all 12 of the valet operators drive their vehicle to the site[,] you still have a buffer of 32 parking spaces."

257.    Mr. McDonough, the Masjid's Planner testified at the same hearing that, "166 space[s] [are] being provided, where 151 would be required if we take all the mats, count them as chairs then divide by three, which is the requirement for [the Borough's] ordinance."

258.    Following the October 16, 2024 hearing, the Masjid met with the Board professionals in workshop meetings on December 11, 2024, February 27, 2025 and April 2, 2025 in an attempt to resolve any reluctance by the Board to adhere to the Code's off-street parking requirement.

259. On the morning of the December 11, 2024 meeting, Board Engineer Jay Cornell sent a letter to the Board acknowledging that under the current plans, the maximum number of spaces needed would be 151.

260. As a result of these meetings and in an effort to head off any further concerns of the Board, the Masjid submitted a revised site plan, an updated traffic analysis, and two reports on the Masjid's schedule and use to the Board for consideration at its April 16, 2025 hearing.

261. On April 16, 2025, the Board once again heard testimony on the PB Application.

262. On April 16, 2025, the day of the scheduled hearing, the Board Engineer issued a new report acknowledging that the Masjid had made the following revisions at the request of the Board:

1) Previous inconsistencies with the sizes of the various rooms within the building have been resolved.

2) A set number of prayer mats (321) for the Prayer Halls have been shown on the plans,

3) A detailed breakdown of all of the rooms in the building as well as their hours of operation has been provided.

4) A required parking space number for the site based upon all proposed uses in the building and Borough Ordinance standards has been determined to be 250 spaces.

5) The previously proposed lift system for the garage area has been eliminated.

6) A summary of the hours of services for the different seasons has been provided.

7) Additional traffic related information has been provided.

8) A detailed breakdown of the weekly parking demands based upon all the various proposed uses within the building has been provided.

9) A proposal to provide some additional parking at an offsite location has been submitted.

263.    The Masjid's revised architectural plan depicted the location of 321 spaces for prayer mats in the prayer halls, 236 in the men's prayer hall and 84 in the women's prayer hall.

264.    The revised site plan removed the parking lifts, reducing the number of off-street parking spaces to 107, one for every three prayer mat spaces or seats, consistent with Code § 26-88.

265.    The revisions to the parking spaces on the site plan were undertaken based upon a suggestion from Board professionals that it would ease concerns about traffic congestion.

266.    The Masjid testified at the hearing that it would lease a 22-space parking lot of a shut-down hot dog stand to be used as overflow parking in the event that additional parking was needed.

267.    In addition to the on-site parking proposed, which alone satisfied the Code, and the lease of the overflow lot; the Masjid testified that it could also use the parking lot of Samsel Upper Elementary School, which is only three blocks down from the Subject Property and regularly hosts the Masjid for holidays and high holy days.

268.    The Masjid had already indicated that it would agree to a condition not to have any other activities on site at the same time that prayer services were occurring and reiterated this at the hearing.

269.    In furtherance of the same, the Masjid presented a sample schedule of use that displayed set times that prayers would be occurring and all secondary functions of the Masjid would be closed during those times.

270.    The Masjid also provided the Board with estimations of attendance for various services.

271.     On Fridays, the most important day of the week in the Islamic faith, the Masjid has two mid-day services; 190 congregants at the first service and 80 at the second service.

272.     This normal attendance per service, based upon two years' operation, is significantly below the 321 prayer spaces provided for on the revised site plan.

273.     In addition to Friday afternoon services, the Masjid advised the Board that it had an average of 35 congregants at early morning prayer, 20 congregants at noon prayer, 20 congregants at mid-afternoon prayer on days other than Friday, 35 congregants at sunset prayer and 45 congregants at evening prayer.

274.     The Masjid also presented a report on the uses of the Masjid outside of prayer times.

275.     The multipurpose room would hold an estimated 80 attendees for life cycle events, most of which would occur between noon and afternoon prayers.

276.     The basketball court and men's and women's exercise areas would only be open before noon prayer and after afternoon prayer. Each expected to have no more than 30 people using them at any given time.

277.     The boys and girls youth activities would be held at night and were expected to each have no more than 15 attendees.

278.     The religious classes would have 10 attendees per class.

279.     Based on this proposed use, the Masjid testified that, outside of Friday prayer hours, which would be limited by prayer space, the highest expected capacity would be during Sunday School hours assuming the fitness areas, basketball courts and youth activity rooms were all being utilized. In that case, the demand would still be only 95 parking spaces.

280.     Given the revised site plan and the restrictions on non-assembly activities, Vice-Chairman Muller asked if the Masjid was still asking for a parking variance.

281.    The Masjid represented that they would not be seeking a variance because even at "the highest occupancy load which would be for the Friday afternoon services, based upon the ordinance we are required to have 107 parking spaces, and that's what we provided."

282.    The Board Counsel stated "reading the ordinance if you take it literally, you don't require a variance, but just for belts and suspenders I would recommend that you request one."

283.    The Masjid ultimately chose to request a parking variance at the suggestion of the Board.

284.    The Board discriminated against the Masjid in the application of the Borough's off-street parking requirements to the PB Application.

285.    In addition to the departures from the customary practices of the Board regarding retention of an independent traffic consultant and RLUIPA attorney, alternate location for the meetings and charging the Masjid for expenses associated with these as noted above, the Masjid was subjected to other unusual requests and questioning from the Board and its professionals, including the following:

   a. Conducting a vibration study prior to any construction, which would be a condition of any approval.

   b. Providing police traffic control at the Subject Property every Friday or to have mosque members monitor the traffic and perhaps receive special training.

   c. "Can you describe the wall-to-wall carpet for us, please; there's an architectural design in the carpet?" "How many of these architectural spaces are shown, are going to be on the flooring?"

   d. "I'm assuming now you're not holding basketball games . . . , but 20 years from now maybe you are [so] I'm recommending to the board, for flexibility in the future, that some sort of bus be allowed to get on the site."

### K.    The Denial Of The PB Application

286.    On June 4, 2025, the Board held a vote on the PB Application, subject to all of the conditions and modifications that had been agreed to by the Masjid.

287.    The meeting opened with a role call, in which the members were called in alphabetical order, as is the standard practice.

288.    At the time of the vote, there remained five variances and five design waivers from the site plan performance standards for the Masjid's application, which fully conformed to the conditional use requirements for a place of worship and for which the Masjid offered many conditions as noted below.

289.    The remaining modest variances were from the following Code provisions:

a.    Code § 26-98.1(8)(b)(8), which prohibits parking spaces located within the front yard setback; the PB Application proposed multiple spaces within the front yard setback;

b.    Code § 26-84.1(b)(13), which prohibits signage within the front yard setback; the PB Application proposed to have signage within the front setback;

c.    Code § 26-82.6(a)(3), which prohibits an accessory structure within 10 feet of the main building; the PB Application proposed to build the minaret 7.14 feet from the main building; and

d.    Code § 26-96.1(e), which prohibits flat roofs in residential areas; the PB Application proposed the Mosque roof to be flat.

e.    Code § 26-88.1, which requires "1 for each 3 seats. Where the specific amount of seating is undetermined, then 1 parking space shall be required for each 250 square feet of assemblage area" for a house of worship. The PB Application had a prayer area with a capacity of 321 prayer spots and 107 parking spaces.

290.    The PB Application also requested design waivers from the following Code provisions:

a.    Code § 26-88, which requires a 12 foot by 50 foot loading area for any building over 25,000 square feet; the PB application did not include a loading area;

b. Code § 26-98.3(f), which requires a deceleration lane for traffic turning into any development providing 100 or more parking spaces; Ernston Rd. is regulated by Middlesex County, which had decided not to require an additional lane added to Ernston Rd;

c. Code §26-99.6D(e), which requires that all lawn and landscaped areas must be graded to provide a minimum slope of two (2%) percent; the Masjid had demonstrated that Subject Property could drain effectively with a flat landscape;

d. Code § 26-98.1(6), which requires sidewalks between parking areas and principle structures; the PB Application did not include sidewalks; and

e. Code § 26-98.1(5), which requires curbing and planted islands within the parking area; the PB Application proposed head-to-head parking;

291. The Masjid agreed to the following exhaustive list of conditions of approval:

1)    No call to prayer will be announced outside the building;

2)    No occupancy would be permitted in the minaret;

3)    Basketball courts and multipurpose rooms will not be utilized for religious services;

4)    A licensed professional engineer will perform predevelopment inspections of all foundations of existing houses adjacent to the Property;

5)    The building will not be open for 24 hours a day;

6)    The Friday afternoon prayer service will be split into two sessions;

7)    Police officers will be hired to assist with traffic control during the Friday afternoon services;

8)    Visitors to the mosque will not be permitted to park on the adjacent residential streets;

9)    No other activities will be permitted in the building during Friday afternoon services;

10)    The parking lot will be closed when full occupancy is reached;

11)    The Masjid will comply with the submitted operations manual;

12)    A copy of executed lease of 22 offsite parking spaces on Johnson's Lane will be provided;

13) Garbage pickups will be performed during off-peak hours;

14) The maximum occupancy of the building at any time will be 321;

15) Police officers will be hired and assist with traffic control during special events and Ramadan;

16) Two dedicated monitors will be provided to enforce onsite traffic control.

17) The applicant will contact the Borough Historical Society and ask if they are interested in the contents of the existing house located at 214 Ernston Road.  If interested, the applicant will allow historical society to remove any requested items;

18) The applicant will contact Middlesex County and request their approval for the installation of crosswalks on Ernston Road.  The applicant will also install crosswalks and handicap ramps at all locations approved by Middlesex County.

19) The applicant will comply with the conditions set forth in the following reports:

   a) Reports prepared by CME Associates, dated February 21, 2024, October 16, 2024, and April 16, 2025;

   b) Reports prepared by Bright View Engineering, dated April 9, 2024, October 11, 2024, and April 11, 2025;

   c) Reports prepared by Acuity Consulting Services and dated April 7, 2025; and

   d) Report prepared by Michael P. Fowler Associates, LLC, and dated February 16, 2024;

20) The applicant shall coordinate traffic control issues with the police department in advance of events and shall:

   a) employ off-duty police officers for events as determined by the police department;

   b) distribute fliers and email blasts to the congregation advising of additional offsite parking locations and to abide traffic officers and parking regulations;

   c) install signage for events at least one week in advance at locations determined by the police department; and

d) use offsite parking and busing to and from offsite locations in coordination with the applicant in conjunction with the board engineer, and shall conduct traffic studies.

21) The applicant in conjunction with the board engineer shall conduct traffic studies during the first full year of operation of the new mosque, which studies shall include:

a) traffic counts during normal weekday activities and services;

b) traffic counts during Friday afternoon prayer services;

c) traffic counts during weekend activities, including a wedding;

d) traffic counts during Ramadan; and

e) submit a traffic report after the first year of operations to the board professionals.

22) If the report shows an increase in traffic above 5 percent of the levels testified by the applicant, its traffic engineer, and contained in the Traffic Impact Study, the applicant shall meet with the board professionals and the police department to determine if additional measures should be employed to alleviate the impact of the additional traffic, including obtaining additional offsite locations and the use of shuttle buses;

23) The applicant shall provide a report that based on the lighting plan, there will be no offsite lighting spillage per the Borough ordinance; and

24) Applicant shall hold the Eid holiday offsite.

292. Upon information and belief, the Board has never before required a similarly situated applicant to satisfy such an extensive list of conditions for approval.

293. The Board's Counsel reminded the Board that the New Jersey "Supreme Court has told us for many, many years that a land use board cannot consider offsite traffic when evaluating these types of applications."

294. Board Member Kandel made a motion to approve the application with all conditions which was second by Member Shah.

295.    Upon information and belief, the normal procedure for voting includes the Board's clerk calling the names of members in alphabetical order.

296.    For the PB Application, however, the clerk first called on Vice-Chair Muller.

297.    Upon information and belief, the Board did not call the vote according to its normal procedure because the Vice-Chair of the Board wanted to highlight the parking issue for the other members.

298.    Vice-Chair Muller voted "no" and said he'd "like to place [his] reasons on the record for voting no.

299.    Vice-Chair Muller started by reading a treatise citing cases that have been granted even when the application did not meet the minimum parking requirement required by code where "there was a demonstrated showing that the reduction in parking was more than adequate to meet the requested use."

300.    Vice-Chair Muller then stated on the record that since the prayer halls "will consist of 321 max" that "under the ordinance, the prayer hall alone would require 107 on-site parking spaces."

301.    He then stated that "The remainder of the proposed building requires another 143 spaces" (emphasis added), despite the Borough Code requiring off-street parking spaces to be based upon seats in the prayer area and that if "the specific amount of seating is undetermined," which was not the case here, the Code requires the off-street parking requirement to be calculated based on the square footage of the assemblage area, but in no case does it require adding these figures together.

302.    Vice-Chair Muller then stated that he was considering traffic reports that had been submitted throughout the hearings, to determine "actual usage," which was improper.

303.    His review focused entirely upon the number of people per vehicle as opposed to the Code's actual requirements with respect to off-street parking spaces.

304.    Muller stated on the record:

      a.    "[O]n Friday, May 17, 2024, from 12 p.m. until 4 p.m. . . . a total of 270 persons enter[ed] the site in 195 vehicles over the four-hour period, which equated to a vehicle occupancy rate of 1.38 persons per vehicle."

      b.    "[O]n Friday, January 17, 2025, from 12 p.m. . . . a total of 263 persons enter[ed] the site in 159 vehicles over the four-hour period. This equates to a vehicle occupancy rate of 1.65 persons per vehicle."

305.    Vice-Chair Muller stated "[i]f you apply these ratios to the 321 occupancy limit," rather than applying it to the actual use "you're still going to -- if it's 1.35 to 1.65, you're still going to need at least 160 parking spots based upon the actual usage."

306.    Muller's ad hoc determination of off-street parking space requirements was contrary to the Code's requirements, and discriminated against the Masjid.

307.    Vice-Chair Muller acknowledged the testimony that no more than 121 vehicles were ever observed at the firehall during "actual usage" by the Masjid.

308.    Despite having being reminded by Board's counsel that off-site traffic conditions is not relevant to the PB application, Vice-Chair Muller read from the October 14, 2024 transcript in which he asked Masjid's Planner whether it would "create a substantial burden in the area having 30 cars looking for parking on Ernston Road?"

309.    Vice-Chair Muller read further down in the transcript where he again asked about the impact on traffic and the Masjid's planner referred him back to the unrefuted testimony by

four witnesses including the planner that all testified that the parking provided would be adequate for the actual use of the property and would not significantly impact traffic.

310.    Vice-Chair Muller's (who was permitted to speak first) unfounded concerns and mischaracterization of the Borough Code requirement regarding parking were then echoed by other Board members in voting to deny the PB Application.

311.    After Vice-Chair Muller concluded, Board Member Kandal voted no stating he "concur[ed] with the reasons given by Mr. Muller."

312.    Member Shaw voted no stating that he had "real concerns about overflow parking, traffic circulation, and the safety of pedestrians and neighboring uses."

313.    Member Volosin voted no and expressed concern that "only 107 spots" could "create confusion and congestion."

314.    Member Williams voted no and clarified he "agree[s] with everything Mr. Muller said." He added that "pedestrian safety" was "on the top of [his] list" and he would "disagree with having anything there."

315.    Member Zebrowski voted no, falsely claiming that "both the Borough and the applicant agreed finally that 250 parking spaces were required."

316.    He then acknowledged the testimony of experts that the parking "might meet the on-site need," but he didn't "believe it fulfills the standard established in our zoning framework."

317.    Member Tighe voted last, also voting no and saying "the variances and the parking" were what he was "most concerned[ed] with."

318.    During the course of the hearings, objectors had also raised many comments complaining about the *compliant* number of the Masjid's off-street parking spaces, to which the Board was responsive, including:

44

a.    What alternate plan do you have because you have 109 spaces, Ernston Road does not have on-street parking, so -- which means that the overflow parking typically would go onto the residential streets whether it's Sayreville Old Bridge.

b.    What I fail to understand is if the house of worship can accommodate 667 patrons at one time, then why would 109 parking spaces be adequate to address that much crowd? And I just can't understand because as a planner, when you plan, you plan for the future, you're planning -- you're designing a building that can accommodate much more patrons. So then why would you not provide the services, like the parking, for that many people?

c.    I have an issue with parking spots proposed. They're facing my house, which means headlights will be shining on my house, and I have issue with that.

d.    Yeah, like Parkway Place,  you know, if say, you know, we want to make sure people aren't going to be parking on Parkway Place,  is there some sort of amenity that is going to be  provided, like parking permits? Is that in the plan?

e.    Additional concerns, parking permits. As was mentioned by Mr. James, is there a way that we can ensure that no one will be parking on these streets that doesn't live there, so resident permits?

f.    However, in model year 2027, which starts in 2026, Advanced Clean Car Number 2 is the law in New Jersey which mandates 37 percent of all light vehicles sold in New Jersey be electric, which escalates to 100 percent in 2035. . . . that we don't have sufficient parking on 29 parking spots just to fulfill the obligation either 151 or 196.

g.    There was testimony that if the parking lot was full asked to go home and circle back and come later on. If there's 25 queue available and the street is full, the parking lot queue is full and the police officers direct them somewhere else and they decide to go home, and they know that the service will be done in one hour and they have an hour break. They will come back in addition to the people who were intending to come to the second service. Do you not see an overload on the second service coming in at the time as well?

h.    So I guess my question is then if 70 percent of the new cars being sold are not going to work with lifts or potentially be parked underground, how are

the 45 total -- or 43, I don't know exactly what the number is -- spots outside going to accommodate the need for parking we're going to have?

i.      So the fact that they need to double or triple the size of the parking for this establishment in such a condensed space, the structure and building of that underground parking structure, can you speak to the safety of that and the condensed nature of that?

j.      You said that there's 43 surface parking spots, some of which are going to be used for the valet or holding area. You had said that the full-size SUVs will be on surface parking because they don't fit. What model vehicles are considered full-size SUV?

k.      The other concern I have about that is I think you are only going to go to those 22 spaces if you first go and see that the 107 spaces are filled up. And you then have to go there. So I think that creates a little bit of a problem that might make it difficult.

l.      Oh, I have been there. I live nearby, we've seen. Oh, the next part is when I'm looking at the CME report, and we're looking at the non-prayer hall areas, 59 spaces for the basketball court, three spaces for the office staff, 53 space for classrooms and 28 parking spaces for the assembly area, that's 143 parking spaces, and you have 107, I believe. So that also goes into play.

m.      Did you count how many were parked at any individual time? I happen to live there and I did. And if you count the number of vehicles that were in the parking lot -- they parked illegally, by the way -- and the cars that were parked in front of the parking area and cars that were parked on the side of the firehouse, and the cars that were parked on the hill by the Little League field, and the cars parked across the street, I totaled an absolute minimum of 126 cars.

n.      If there's rain Ernston, Bordentown, the bottom of Parkway Place, floods. If they had people parking, and I'm very sorry, not everybody is going to say, oh, I can't park here, let me just go down, cross Bordentown and park over here. They're going to go through the neighborhood and park in the streets, because they already park illegally. They don't care.

o.      Parking, and when the parking lot is full, police officers say you cannot park here, and the first available parking spot is Parkway Place, what prevents people from parking on Parkway Place, Louis Street and Center Street, and making a loop around to take another bite at the entrance to the facility?

p.   I think it's kind of a clear testament to the fact that we know that parking isn't sufficient, but that's just my opinion.

q.   Also if their parking spaces fill up the thought that worshipers would cross Bordentown Avenue, park on Johnson Lane, walk across Bordentown Avenue to the mosque is not logical. The service may end before they get there. I suspect people would be parking on the side streets of my neighborhood and limiting parking in front of my neighbor's homes and my home.

r.   If this 43,000-square-foot building does not have enough parking for the droves of people that will attend the many daily services and all the other events in between, then you can bet that we will get overflow in the Parkway Homes.

s.   I understand the concerns that neighbors have and anybody has about traffic and things like that, but from a legal perspective I think this application rises or falls on the issue of parking. I think that's the only variance.

t.   The parking is a big concern. Like a huge concern. That building is giant, and we're naive to think they're not going to fill that building. And if you think 100 spots or 120 spots are going to cut it, it's going to be a big mistake.

u.   Pertaining to the overflow parking on Johnson Lane the other concern would be the crosswalk going over Bordentown Avenue. And just to make the note that anyone who uses that area for overflow parking, when they are going to leave their cars and leave that area, there is a no left-hand turn onto Ernston Road at that point, so I hope that is honored.

v.   Right now the amount of parking is severely insufficient I think, as we all have been talking about. And there's really not room for growth.  [T]here's a variance for 16 spots that would be part of the setback. So if you took that out of the equation, if you did not approve that, now we're even grossly more insufficient in parking.

w.   I believe the site is too small for the structure, parking, safe access for attendees and the public driving past. The variances required to prove the application should not be granted. Insufficient parking against borough requirements. The number is contested, I still don't know what they're providing versus what is suggested and demanded by the borough.

x.   I can anecdotally tell you that if there are multiple cars in front of me I cannot drive through the car. If there are multiple cars accessing the parking spots, I cannot access the exits, nor can I get onto the site, which has more

negative impact on Ernston Road because they will not even make the site because the driveway is full regardless of a patrolman dictating/directing traffic in and out.

y.    I know Eid was considered, was still going to be held off-site at a park, Kennedy Park however, Ramadan is now going to be celebrated at Ernston Road. And again parking, huge issue for that celebration.

319.    In voting to deny the PB Application on the basis of the parking issue, the Board was responsive to hostile objectors.  As described below, many objectors had also expressed anti-Muslim animus.

320.    Despite the concurrence of the Masjid and Board's own counsel that there existed no issue with respect to the number of off-street parking spaces provided, and that the PB Application, as revised, satisfied the Code's requirements, the Planning Board nevertheless concluded otherwise.

321.    The Board's decision to deny the PB Application on the basis of off-street parking was arbitrary, capricious and unreasonable as a matter of law, and was a pretextual justification designed to hide the Board's and local objectors' discriminatory animus against the Plaintiffs.

322.    In response to Objectors' and Board members' and professionals' comments, the Masjid revised its site plans four times during the course of the hearings before the Board.

323.    The Planning Board also refused to grant the PB Application subject to conditions, even though many had been offered by the Masjid and discussed between the parties during the hearings.

### L.    Defendant Board Has Violated State Law by Failing to Issue a Resolution on the PB Application

324.    Pursuant to N.J.S.A. § 40:55D-10(g)(2), the Board is required to adopt a memorializing resolution of its decision, "at a meeting held not later than 45 days after the date of the meeting at which the municipal agency voted to deny the application."

325.    Pursuant to New Jersey law, the Board was required to adopt a resolution no later than July 19, 2025.

326.    The Board held meetings on July 16, August 6, August 20, and September 17, 2025.

327.    The Resolution for the PB Application was not introduced at any of those meetings.

328.    The Board canceled scheduled meetings on September 3, October 1, and October 15, 2025.

329.    In late October, the Borough website posted an agenda for the Board meeting for November 5, 2025, which listed "Memorialization of Resolution; Masjid Sadar Community Center/House of Worship Site Plan" as the first item of business after "Roll Call."

330.    However, on the morning of November 5, 2025, the Board meeting was removed from the Borough website and no meeting was held.

331.    It has now been more than four months since the Board was required to adopt its memorializing Resolution and its failure to do so has resulted in more delay and prejudice to the Masjid.

**M.    *The Land Use Process Was Dominated by Hostility Toward the Masjid and Not Relevant Land Use Criteria***

332.    The Defendants have a history of significant hostility against minority religious assemblies.

333.    Upon information and belief, the Board has been responsive to local residents' hostility toward minority religions developing houses of worship.

334.    In 1993, the Defendants settled a suit with Shree Dwarkadhish Temple ("Shree") permitting it to move forward with construction of its Temple.

335.    Shree filed suit against the Defendant after Shree's request to build a house of worship was denied by the Board.

49

336.    Shree alleged that the denial of their application before the Board was in response to bigotry and hostility by local residents.

337.    Newspaper reports recounted locals conflating the temple with the 1992 attack on the World Trade Center and anxieties that the borough would become a "Hindu Hilton."

338.    In 2014, Shree once again filed suit against the Borough and Board when their application to expand was once again denied by the Board.

339.    Shree alleged that the Board required Shree to obtain a variance where no variance was required.

340.    Shree alleged that "the Borough, its boards and its personnel have interpreted, implemented and enforced the Borough's land use regulations to delay Plaintiff Temple's applications to . . . construct a new house of worship."

341.    Shree alleged that, "as a result of the official actions taken by Borough, its boards and its personnel," Shree was compelled to "attend unnecessary interpretation hearings."

342.    In 2018, that suit was settled and Shree was permitted to expand the existing Temple.

343.    Just as with consideration of the Shree application, the public voiced tremendous opposition to the Masjid with clearly discriminatory tones and comments during the PB Application process.

344.    This was acknowledged by the Borough engineer who noted "[t]his is a similar situation to" Shree.

345.    Opposition to the Masjid on the basis of religion by the public was so common and well-known to the Board that Chairman Tighe was compelled to remind the public that "questions or comments about religious beliefs, stereotypes, political opinions and current events are not

relevant to this application and will not be permitted."

346.    Despite this disclaimer, many questions and comments were made that showed open hostility to the Masjid on the basis of religion.

347.    A nonexhaustive list of comments made by residents targeting the Masjid and its religion include:

1.    "You know, why don't you go on Route 35? Route 9? There's plenty of room for you, and you wouldn't need all this aggravation. You've upset everybody from Sayreville to Old Bridge."

2.    We know when the Indians have their holidays they come from Edison, they come from all over…You know they're going to come from other towns on Ramadan. They're going to come from all over."

3.    One resident asked if the crescent on the top of the Masjid would be visible from route 9 and a person in the audience shouted "yeah of course. I'll never see the sun again."

4.    "Next, I want to know if anyone has contacted Masjid Al-Wali in Edison? Because I have. And I know for a fact that they have an 18,500-square-foot facility that they only asked for 50 parking spaces when they opened, but then initially asked for an additional 100 spaces after that, which means that that's likely going to happen here."

5.    "We have 1,600 Muslims in the close vicinity... you can have 300 [congregants], right? A year later it's at 600. Who's accountable for that?... Are we going to put penalties and fines and fees on them every time somebody goes over 300?"

6.    "How are we going to make them accountable for making it become a disaster? It might not be a disaster day 1, day 2; when things grow, fastest Muslim community, fastest religion growing; how are you going to tell me this community ain't going to grow?"

7.    "All of us who live in Sayreville know it's a disaster."

8.    "I pay taxes... If my property and lifestyle get ruined because there's services at 10:30, 11 o'clock at night... who do I complain to?"

348.    The Planning Director from neighboring Old Bridge Township attended the hearings on April 11, 2024 and May 11, 2024 to warn that the current number of congregants

attending the Masjid would expand.

349.    The Old Bridge Planning Director warned the Board "I kept hearing that the congregation will not grow" but the "house of worship on Route 35" in Old Bridge "has expanded" and the "facility on Spring Valley Road" (another mosque in Old Bridge) "has gone through expansion over the years."

350.    She asserted "It's hard to believe that a congregation would not grow."

351.    On March 28, 2024, prior to the Board having heard any testimony on the PB Application, the Old Bridge Township Mayor issued a letter to "Chairman of the Sayreville Planning Board and Members of the Planning Board."

352.    The letter stated that at "numerous" Township Council meetings, residents have "voiced serious concerns over the impacts of the proposed development."

353.    In response to these comments, the Township Planner and Engineer reviewed the PB Application.

354.    The letter was to "bring forth some of the issues cited by Old Bridge residents" and the observations of the Township Professionals.

355.    The letter from the Mayor questioned "[i]s this a community center with religious services or a house of worship with related accessory uses?

356.    The Mayor concluded "[b]ased on the available information," that "the community center appears to be mutually exclusive of the house of worship."

357.    Upon information and belief, the Mayor has not questioned another house of worship in the Borough in this fashion and this demonstrated hostility toward the Masjid's use.

358.    Opposition by local residents to the Masjid on the basis of religion was being vocalized even more explicitly outside of formal hearings.

359.    On April 8, 2025, notice was posted on the Facebook page for the Borough that there would be a hearing on the Masjid.

360.    Comments on that Facebook post include:

1.      "Nothing creeps me out more than seeing a woman in a Burka"

2.      "No matter how they try to cover it, Muslims HATE All Jews AND Christians! Wake UP!!!"

3.      "if they have their way they WILL eliminate YOU & every Christian, Jew, etc. on this Planet! You're apparently forgotten the 3000 Innocents People Murdered on 9/11."

4.      "that religion has a day of atonement ... Ashura... it's about hurting themselves for their God .. a father will slice open his little boys scalp while he cries and bleeds."

5.      "You're incapable of assimilating to any western country. You demonstrate that wherever you people go."

6.      "The caliphate is here. It has to stop. Read the Karan [sic]. They hate Christians and Jews.."

7.      "They are not nice people. They think woman are beneath them and are very arrogant people. I say go build one in the middle of the desert."

8.      "Let's think of all the Evil things Muslims have done to all Our people, Christians, Jewish people, remember 9/11? I believe it was Egypt, Lebanon, and Saudi Arabians, your people should stay where you came from because you are evil."

9.      "Do the NOT remember 9/11 and the Muslim neighborhoods thru out NJ CHEERING after it happened."

10.     "Another Jihad coordination center. Just swell. They already have Edison and are expanding."

11.     "Isn't this still America? WE are just inviting them to take over."

12.     "All and every Sayreville resident should got to the meetings and oppose any ideas of mosques in their town at all."

13.     "ISLAM RELIGION OF GENOCIDE - PEDOPHILIA - RAPE TORTURE - PERSECUTION - INCEST DOMESTIC ABUSE - CHILD ABUSE ETHNIC CLENSING - CRUCIFIXTION- STONING - BEHEADING - DISMEMBERING NO PEACE ANYWHERE"

361.    There have been many other social media posts from residents who oppose the PB Application. Some of these posts include, but are not limited to, the following:

1.    "When the masjid sadar gets built on ernston rd everyone going to sale there houses"

a.    In reply, another resident said, "which is probably part of the plan."

2.    "It was suggested that the Board use the applicant's escrow funds to retain a Religious Land Use and Institutionalized Persons Act (RULIPA) attorney and a traffic consultant to provide advice. I'm glad that advice was followed and the board met with at least one of those professionals on Monday, April 1."

3.    "I repeat that going forward Sayreville needs to consider returning to at least a three-acre minimum which would limit future religious use applications to areas where larger, more open tracts are available. There are other areas in town, with larger tracts, where high intensity uses such as churches, temples and mosques would have less impact."

362.    The Board was responsive to the hostility vocalized by the community, many of whom demonstrated clear bias.

363.    This included the Board being responsive to the comments from the public regarding parking.

364.    In his initial report to the Board, the Borough Engineer acknowledged that the 2021-2022 citations and the State Action were driven by complaints from members of the community.

365.    In a campaign letter to "Sayerville Residents" circulated in the Fall of 2025 by the Borough Council President made the Masjid's denial a campaign issue stating:

a.    the vote "to deny the application for a mosque development on Ernston Road . . . was made after listening to residents' concerns."

b.    "Sayerville cannot allow projects that would overwhelm our infrastructure or jeopardize the character of our neighborhoods."

54

366.    The letter concludes by asking residents for support on Election Day "so we can keep Sayreville moving in the right direction."

367.    On December 10, 2025, the Borough Council President introduced a motion to appraise the Subject Property to acquire it.

368.    In so introducing the Motion, the Borough Council President stated: "The owners don't want to sell to us so we've got a great challenge, it's not as easy as just saying 'let's just buy it; lets just take it'... So that is why we can't just do what people want us to do. We are trying our hardest to get this done."

369.    One Council member reminded the Council that there was potential litigation concerning the Subject Property.

370.    Another Council member opposed the motion to have the Subject Property appraised "only because" the property was "a matter involving the approvals that were denied by the Planning Board."

371.    The Council President acknowledged that statement "ok so it's still pending."

372.    The Mayor then voiced his concerns with the Motion, in part, because "Sayreville doesn't have a good history of going to Court on land property, uhh, we don't have a good batting average."

373.    Upon information and belief, this exchange evidenced a clear intention by the Borough to acquire the Subject Property in order to ensure that the mosque would not be built, and its agents to delay potential litigation as long as possible.

**N.      The Borough's Land Use Regulations Treat
Houses of Worship Differently and Worse than other
Nonreligious Institutional and Assembly Uses**

374.    The Borough's Code discriminates against Houses of Worship in favor of various nonreligious assembly and institutional uses with respect to not only uses permitted, but minimum lot area, minimum lot width, setback, and off street parking requirements.

375.    In the R-7 zoning district where the Subject Property is located, permitted uses include other nonreligious assembly and institutional land uses, including:

       1)  Institutional and Public Uses

       2)  Community Shelters

       3)  Community Residences.  (Code § 26-89.)

376.    Institutional and public uses means non-profit public or quasi-public institutions and uses, such as public and private schools, libraries and municipally-owned or operated buildings, structures or land used for public purposes, not including houses of worship.  (Code § 26-6.)

377.    Such nonreligious assembly and institutional land uses are treated on better terms under the Borough's land use regulations than are houses of worship.

378.    The minimum lot area requirement for houses of worship in the R-7 zoning district is one acre.  (Code § 26-89.)

379.    The minimum lot area requirement for other nonreligious assembly and institutional uses in the R-7 zoning district include:

       1)  Institutional and Public Uses: 7,500 square feet

       2)  Community Shelters: 7,500 square feet

       3)  Community Residences: 7,500 square feet.  (Code § 26-89.)

380.    Other nonreligious assembly and institutional uses in the R-7 zoning district are treated on better terms than religious land uses with respect to the minimum lot area requirement.

381.   The minimum lot width requirement for the conditional use of house of worship in the R-7 zoning district is 100 feet.  (Code § 26-89.)

382.   The minimum lot width requirement for other nonreligious assembly and institutional uses in the R-7 zoning district include:

    1)  Institutional and Public Uses: 75 feet

    2)  Community Shelters: 75 feet

    3)  Community Residences: 75 feet.  (Code § 26-89.)

383.   Other nonreligious assembly and institutional uses in R-7 zoning district are treated on better terms than religious land uses with respect to the minimum lot width requirement.

384.   The minimum front yard setback requirement for the conditional use of house of worship in the R-7 zoning district is 50 feet.  (Code § 26-89.)

385.   The minimum front yard setback requirement for other nonreligious assembly and institutional uses in the R-7 zoning district include:

    1)  Institutional and Public Uses: 20 feet

    2)  Community Shelters: 20 square feet

    3)  Community Residences: 20 square feet. (Code § 26-89.)

386.   Other nonreligious assembly and institutional uses in the R-7 zoning district are treated on better terms than religious land uses with respect to the front yard setback requirement.

387.   The minimum side yard setback requirement for houses of worship in the R-7 zoning district is 25 feet on each side and 50 feet total. (Code § 26-89.)

388.   The minimum side yard setback requirement for other nonreligious assembly and institutional uses in the R-7 zoning district include:

    1)  Institutional and Public Uses: eight (8) feet on each side and 20 feet total

2) Community Shelters: eight (8) feet on each side and 20 feet total

3) Community Residence:  eight (8) feet on each side and 20 feet total (Code § 26-89.)

389.    Other nonreligious assembly and institutional uses in the R-7 zoning district are treated on better terms than religious land uses with respect to the rear yard setback requirement.

390.    The minimum rear yard setback requirement for houses of worship in the R-7 zoning district is 50 feet.  (Code § 26-89.)

391.    The minimum rear yard setback requirement for other nonreligious assembly and institutional uses in the R-7 zoning district include:

1) Institutional and Public Uses: 25 feet

2) Community Shelters: 25 feet

3) Community Residences: 25 feet.  (Code § 26-89.)

392.    Other nonreligious assembly and institutional uses within the Borough are treated on better terms than religious land uses with respect to the minimum lot area requirement.

393.    The minimum lot area requirement for the conditional use of a house of worship in the corresponding zoning districts is 1 acre.  (Code § 26-89.)

394.    The minimum lot area for various other nonreligious assembly and institutional permitted uses in Borough include:

1) Child Care Centers: 5,000 square feet in R-5 zoning districts; 7,500 square feet in PO and PD-7 zoning districts; 10,000 square feet in R-10, PRIME and PD-10 zoning districts; 20,000 square feet in R-20 and B-3 zoning districts; 0.5 acres in B-2 zoning districts; 40,000 square feet in MW zoning districts,

2) Indoor theaters: 20,000 square feet,

3) Full service hotels and suite hotels: 20,000 square feet,

4) Nightclubs: 20,000 square feet,

5)  Health Clubs and Recreational Facilities: 10,000 square feet in B-1 zoning districts; 20,000 square feet in B-3 zoning districts; 0.5 acres in B-2 zoning districts,

6)  Continuing Care Retirement Communities: 0.5 acres; 20,000 square feet; 10,000 square feet,

7)  Nursing Homes: 7,500 square feet in PD-7 and PO zoning districts; 10,000 square feet in B-1, PRIME and PD-10 zoning districts; 20,000 square feet in B-3 zoning districts; 0.5 acres in B-2 zoning districts,

8)  Assisted living facilities: 7,500 square feet in PO zoning districts; 10,000 square feet in B-1 and PRIME zoning districts; 20,000 square feet in B-3 zoning districts; 0.5 acre in B-2 zoning districts, and

9)  Funeral homes: 0.5 acres. (Code § 26-89.)

395.    Other nonreligious assembly and institutional uses are treated on better terms than religious land uses with respect to the minimum front setback requirement.

396.    While the minimum front setback requirement for the conditional use of a house of worship in the corresponding zoning districts is 50 feet (Code § 26-89), the minimum front setbacks for various other nonreligious assembly and institutional permitted uses in Borough include:

1)  Child Care Centers: 20 feet,

2)  Indoor theaters: 20 feet,

3)  Full service hotels and suite hotels: 20 feet,

4)  Nightclubs: 20 feet,

5)  Health Clubs and Recreational Facilities: 20 feet,

6)  Continuing Care Retirement Communities: 20 feet,

7)  Nursing Homes: 20 feet,

8)  Assisted living facilities: 20 feet, and

9)  Funeral homes:20 feet.  (Code § 26-89.)

397.    Other nonreligious assembly and institutional uses are treated on better terms than religious land uses with respect to the minimum side yard setback requirement.

398.    The minimum side yard setback requirement for a house of worship in the corresponding zoning districts is 25 feet on each side, 50 feet total.  (Code § 26-89.)

399.    The minimum side yard setback for various other nonreligious assembly and institutional permitted uses in Borough include:

1)    Child Care Centers: 10 feet on each side, 20 feet total,

2)    Indoor theaters:  10 feet on each side, 20 feet total,

3)    Full service hotels and suite hotels:  10 feet on each side, 20 feet total,

4)    Nightclubs:  10 feet on each side, 20 feet total,

5)    Health Clubs and Recreational Facilities: 10 feet on each side, 20 feet total,

6)    Continuing Care Retirement Communities:  8 feet on each side, 20 feet total in PO zoning districts; 10 feet on each side, 20 feet total in B-1, B-2 and B-3 zoning districts; 10 feet on each side, 20 feet total in PD-10 zoning districts,

7)    Nursing Homes:  8 feet on each side, 20 feet total in PO districts; 10 feet on each side, 20 feet total in B-1, B-2 and B-3 zoning districts,

8)    Assisted living facilities:  8 feet on each side, 20 feet total  in PO districts; 10 feet on each side, 20 feet total in B-1, B-2 and B-3 zoning districts, and

9)    Funeral homes: 10 feet on each side, 20 feet total.  (Code § 26-89.)

400.    Other nonreligious assembly and institutional uses are treated on better terms than religious land uses with respect to the minimum rear setback requirement.

401.    The minimum rear setback requirement for the conditional use of a house of worship in the corresponding zoning districts is 50 feet.  (Code § 26-89.)

402.    The minimum rear yard setback for various other nonreligious assembly and institutional permitted uses in Borough include:

1) Child Care Centers: 20 feet in B-1 zoning districts; 25 feet in B-3 zoning districts; 35 feet in B-2 zoning districts; 40 feet in SED zoning districts,

2) Indoor theaters:  25 feet,

3) Full service hotels and suite hotels:  25 feet,

4) Nightclubs:  25 feet,

5) Health Clubs and Recreational Facilities: 20 feet in B-1 zoning districts; 25 feet in B-2 and B-3 zoning districts; 30 feet in PRIME zoning districts; 40 feet in SED zoning districts,

6) Continuing Care Retirement Communities:  20 feet in B-1 zoning districts; 25 feet in PO, B-2 and B-3 zoning districts; 30 feet in PRIME, PD-7 and PD-10 zoning districts,

7) Nursing Homes:  20 feet in B-1 zoning districts; 25 feet in PO, B-2 and B-3 zoning districts; 30 feet in PRIME zoning districts,

8) Assisted living facilities:  20 feet in B-1 zoning districts; 25 feet in PO, B-2 and B-3 zoning districts; 30 feet in PRIME zoning districts, and

9) Funeral homes: 25 feet in B-2 zoning districts.  (Code § 26-89.)

403.    Other nonreligious assembly and institutional uses are treated on better terms than religious land uses with respect to the maximum lot coverage.

404.    The maximum lot coverage for a house of worship in the corresponding zoning districts is 40%.  (Code §26-89.)

405.    The maximum lot coverage for various other nonreligious assembly and institutional permitted uses in Borough include:

1) Child Care Centers: 60% in MW zoning districts; 80% in I zoning districts; 85% in SED zoning districts, and

2) Health Clubs and Recreational Facilities: 80% in I zoning districts; 85% in SED zoning districts.  (Code §26-89.)

406.    Other nonreligious assembly and institutional uses are treated on better terms than religious land uses with respect to parking spaces required.

407.    Parking spaces required for houses of worship are "1 for each 3 seats. Where the specific amount of seating is undetermined, then 1 parking space shall be required for each 250 square feet of assemblage area."  (Code § 26-88.1)

408.    Parking spaces required for certain non-religious assembly and institutional uses in the Borough include:

1)  Garden Centers and Marinas require only 1 space per each 1,500 square feet of property,

2)  Elementary and intermediate schools require only one per employee, and

3)  Theaters located in shopping centers require 1 space per 4 seats. (Code §26-88.1)

### O.    The Defendants Have Violated Plaintiffs' Rights.

409.    The Board's decision forecloses any ability of the Masjid to use the Subject Property as a place of worship, regardless of the scale, conditions or intensity of such use.

410.    The Masjid does not have any readily available alternatives for a mosque within the Borough.

411.    By completely and repeatedly prohibiting the Mosque from using the Subject Property for a house of worship, the Board has substantially burdened the Masjid's religious exercise.

412.    There is no compelling or legitimate governmental interest that requires the denial of the PB Application.

413.    Denying the PB Application is not the least restrictive means of achieving any governmental interest.

414.    "Houses of worship" are similarly situated to the nonreligious assembly and institutional land uses listed above with respect to any regulatory purposes.

415.    By not permitting Houses of Worship as a permitted use by right anywhere within the Borough, the Borough has unreasonably limited Houses of Worship within its jurisdiction.

416.    The Board's decision was a final decision and was not reviewable by any other administrative body.

417.    The Masjid had a reasonable expectation that their use would be permitted on the Subject Property.

418.    The Board's denial of the PB Application severely impedes and prevents the Mosque's religious exercise.

419.    The construction activity related to the Masjid's proposed house of worship would affect interstate commerce.

420.    The construction's effect on interstate commerce would result from, amongst other things, the Masjid's fundraising activities related to the construction; the transfer of funds to those it engages to construct the addition; the engagement of construction companies to construct the addition; the employment of and payments to construction workers either by the Masjid or by companies engaged by it; the purchase of necessary materials to construct the addition; the engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to construct the addition; the use of interstate communication related to the construction of the addition; and other activities related to the construction of the addition.

421.    The Masjid's operation affects interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication

to facilitate the Masjids's ongoing operations; the use of interstate travel related to the Masjid's ongoing operations; and the purchase of goods and services related to the Masjid's ongoing operations and maintenance.

422.    The Defendants' actions described above all took place under color of state law.

423.    The harm to the Masjid caused by the Defendants' laws and actions, which prevent them from using the Subject Property to accommodate its religious needs, is immediate and severe.

424.    Application of the Code regulations to Masjid's proposed religious land use creates extreme expense, delay and uncertainty for the Masjid.

425.    The Plaintiffs have also suffered significant financial damages as a result of the Defendants' laws and their application to the Masjid.  These include, but are not limited to, the loss of donations, loss of pledges, loss of revenue from religious classes, loss of revenue for life cycle events, costs incurred pursuing the ZBA and PB Applications, carrying costs associated with the Subject Property they are prohibited from using, real property taxes, increase in construction costs, and rental costs for off-site locations.

426.    There are no quick, reliable and viable alternative options for the Masjid's operations.

427.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

## COUNT I

**Religious Land Use and Institutionalized Persons Act of 2000
"Substantial Burdens"
42  U.S.C. § 2000cc(a)**

428.    Paragraphs 1 through 427 are incorporated by reference as if set forth fully herein.

429.     Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that places a substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest, both on their face and as applied to Plaintiffs.

430.     Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

431.     Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT II

**Violation of Religious Land Use and Institutionalized Persons Act of 2000**
**"Equal terms"**
**42 U.S.C. § 2000cc(b)(1)**

432.     Paragraphs 1 through 431 are incorporated by reference as if fully set forth herein.

433.     Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that on their face and as applied treat religious land uses on terms that are less than equal to nonreligious assembly and institutional land uses, both on their face and as applied to Plaintiffs.

434.     Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

435.     Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT III

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Nondiscrimination"**
**42 U.S.C. § 2000cc(b)(2)**

436.    Paragraphs 1 through 435 are incorporated by reference as if set forth fully herein.

437.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that discriminates against them on the basis of religion and religious denomination, both on their face and as applied to Plaintiffs.

438.    Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

439.    Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT IV

**Violation of Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(3)(B)**
**"Exclusion and Limits": Unreasonable Limitation**

440.    Paragraphs 1 through 439 are incorporated by reference as if set forth fully herein.

441.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied to Plaintiffs in a manner that unreasonably limits religious assemblies, institutions, and structures within their jurisdiction, both on their face and as applied to Plaintiffs.

442.    Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

443.    Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT V

**United States Constitution, First Amendment**
**42 U.S.C. § 1983**
**Free Exercise of Religion**

444.    Paragraphs 1 through 443 are incorporated by reference as if set forth fully herein.

445.    Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by burdening their religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against them on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

446.    Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

447.    Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT VI

**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Due Process Clause**

448.    Paragraphs 1 through 447 are incorporated by reference as if set forth fully herein.

449.    A law is impermissibly vague under the Federal Constitution, if the law: (1) fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"; or (2) "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972);

450.    Defendants applied the Code in an arbitrary and discriminatory manner.

451.    Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

452.    Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT VII

### Violation of N.J.S.A § 40:55D-10(g)(2)

453.    Paragraphs 1 through 452 are incorporated by reference as if set forth fully herein.

454.    N.J.S.A § 40:55D-10(g)(2) states that a memorializing resolution be adopted at a meeting to be held not later than 45 days after the date of the meeting at which the municipal agency voted to grant or deny approval.

455.    The Board voted to deny the PB Application on June 4, 2025.

456.    The Resolution was therefore due not later than July 16, 2025.

457.    The Defendant Board has failed to adopt said Resolution in violation of N.J.S.A § 40:55D-10(g)(2).

458.    Defendant's actions as aforesaid, have caused significant damage to Plaintiffs.

459.    Defendant Board is liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT VIII

### New Jersey Constitution
### Article I, Paragraphs 1 & 5: Equal Protection
### N.J.S.A. § 10:6-2

460.    Paragraphs 1 through 459 are incorporated by reference as if set forth fully herein.

461.    The New Jersey Constitution, Paragraphs 1 and 5, entitles all persons to equal protection of the law ("State Equal Protection Clause").

462.    Defendants' actions have violated and continue to violate Plaintiffs' rights under the State Equal Protection Clause by intentionally treating Plaintiffs differently from other entities on the basis of religious belief. Among other things, Defendants implemented the Borough's zoning ordinance in a manner that intentionally discriminated on the basis of Plaintiffs' religion

and was different and substantially more burdensome than the implementation of the Borough's zoning ordinance as to other religious or secular organizations.

463. Plaintiffs have suffered injury as a result of the Defendants' actions in violation of the State Equal Protection Clause.

464. Under N.J.S.A. § 10:6-2, Plaintiffs are entitled to a declaratory judgment that the Defendants' actions have violated Plaintiffs' rights under the State Equal Protection Clause.

465. Under N.J.S.A. § 10:6-2, Plaintiffs are entitled to injunctive relief mandating that Plaintiffs' application for site plan approval be granted forthwith.

466. Defendants are liable in damages to Plaintiffs in an amount to be determined at trial.

## COUNT IX

### Violation of the New Jersey Constitution
### Article I, Paragraph 1: Protection Against Injustice
### N.J.S.A. § 10:6-2

467. Paragraphs 1 through 466 are incorporated by reference as if set forth fully herein.

468. Article I, Paragraph 1 of the New Jersey Constitution provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." Under New Jersey Supreme Court Precedent, this provision seeks to protect against injustice and safeguard the principles of due process.

469. Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

470. Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that this Court grant the following relief:

a. An Order finding and declaring that the Board's June 4, 2025 decision denying the PB Application is void, invalid and unconstitutional on the grounds that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the New Jersey Constitution, and New Jersey State law;

b. A judgment that the Board unlawfully denied the PB Application, thereby damaging the Plaintiffs;

c. An order reversing the decision of the Board and an order declaring that the PB Application, as modified, is hereby approved;

d. Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the New Jersey Constitution, or undertaking any and all action in furtherance of these acts;

e.  An award of compensatory damages against Defendants in favor of the Plaintiffs as the Court deems just for the loss of its rights under the Free Exercise Clause of the First Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the New Jersey Constitution, and New Jersey State law incurred by the Plaintiffs and caused by the Defendants' laws and actions;

f.  An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

g.  Such other and further relief as this Court may deem just and appropriate.


Dated: November 21, 2025                    **STORZER & ASSOCIATES, P.C.**

                                            /s/ Sieglinde K. Rath
                                            Sieglinde K. Rath (#048131991)
                                            Matthew D. Sykes (#030912011)
                                            4400 Route 9 South, Suite 1000
                                            Freehold, NJ 07728
                                            rath@storzerlaw.com
                                            sykes@storzerlaw.com
                                            Tel: 410.559.6325
                                            Fax: 202.315.3996


                                            **LAWRENCE SACHS LLC**

                                            /s/ Lawrence Sachs
                                            Lawrence Sachs Esq. (#017701983)
                                            8 Auer Court, Suite G
                                            East Brunswick, NJ 08816, USA
                                            larry@sachslawnj.com
                                            Tel: (732) 613-1441

*Attorneys for Plaintiffs*

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding and that no such action, arbitration or administrative proceeding is contemplated at this time.  I do not know of any other party who should be joined in this action.

Dated:  November 21, 2025                    **STORZER & ASSOCIATES, P.C.**

<u>/s/ Sieglinde K. Rath</u>
Sieglinde K. Rath (#048131991)
Matthew D. Sykes (#030912011)
4400 Route 9 South, Suite 1000
Freehold, NJ 07728
rath@storzerlaw.com
sykes@storzerlaw.com
Tel: 410.559.6325
Fax: 202.315.3996


**LAWRENCE SACHS LLC**

<u>/s/ Lawrence Sachs</u>
Lawrence Sachs Esq. (#017701983)
8 Auer Court, Suite G
East Brunswick, NJ 08816, USA
larry@sachslawnj.com
Tel: (732) 613-1441

*Attorneys for Plaintiffs*