**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MASJID SADAR, INC. and<br>SHAMEER PROPERTIES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BOROUGH OF SAYREVILLE, NEW JERSEY and BOROUGH OF SAYREVILLE, NEW JERSEY PLANNING BOARD,<br><br>Defendants. | Case No. 3:25-cv-17831 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**STORZER & ASSOCIATES, P.C.**
Sieglinde K. Rath (#048131991)
Matthew Sykes (#030912011)
4400 Route 9 South, Suite 1000
Freehold, NJ 07728
Tel: 202.857.9766
Fax: 202.315.3996

*Counsel for Plaintiffs*

## Table of Contents

**PRELIMINARY STATEMENT** .......... 1

**STATEMENT OF FACTS** .......... 1

**A. MSI and Its Mission** .......... 1

**B. Borough Interference and History of Anti-Muslim Animus** .......... 3

**C. MSI's Current Facility and Its Religious Needs** .......... 4

**D. Planning Board Application, and Associated Community Animus and Opposition** .. 5

**E. The Borough Code's Facial Discrimination Against Houses of Worship** .......... 9

**PROCEDURAL HISTORY** .......... 11

**STANDARD OF REVIEW** .......... 11

**ARGUMENT** .......... 12

**I. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.** .......... 12

A. Plaintiffs Are Likely to Succeed on their RLUIPA Equal Terms and Free Exercise Claims Because the Borough's Zoning Code, on Its Face, Treats Places of Worship on Less than Equal Terms as Nonreligious Assembly and Institutional Land Uses. .......... 12

B. Plaintiffs Are Likely to Succeed on their RLUIPA Substantial Burdens and Free Exercise Claims Because the Planning Board's Denial Burdens Their Religious Exercise. 19

**II. MSI WILL SUFFER IRREPARABLE HARM WITHOUT RELIEF.** .......... 27

**III. AN INJUNCTION WILL NOT HARM DEFENDANTS AND WILL SERVE THE PUBLIC INTEREST.** .......... 28

**CONCLUSION** .......... 29

**TABLE OF AUTHORITIES**

**Cases**

*Al Falah Ctr. v. Twp. of Bridgewater*, No. CV 11-2397, 2013 WL 12322637 (D.N.J. Sept. 30, 2013) .......... 12, 15, 21, 32

*AT&T v. Winback & Conserve Program*, 42 F.3d 1421 (3d Cir. 1994) .......... 35

*Bais Brucha Inc. v. Twp. of Toms River, New Jersey*, No. CV213239ZNQRLS, 2024 WL 863698 (D.N.J. Feb. 29, 2024) .......... 18

*Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548 (4th Cir. 2013) 28

*Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004) .......... 24

*Chabad Lubavitch of Litchfield Cty., Inc. v. Borough of Litchfield,* No. 3:09-CV-1419 (JCH), 2016 WL 370696 (D. Conn. Jan. 27, 2016) .......... 30, 31

*Church of Hills of Twp. of Bedminster v. Twp. of Bedminster*, No. CIV. 05-3332 (SRC), 2006 WL 462674 (D.N.J. Feb. 24, 2006) .......... 25

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) .......... 23

*Conestoga Wood Specialities Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.,* No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013) .......... 33

*Congregation Kollel, Inc. v. Twp. of Howell, N.J.*, No. CV 16-2457 (FLW), 2017 WL 637689 (D.N.J. Feb. 16, 2017) .......... 26, 27

*Cottonwood Christian Ctr v. Cypress Redevelopment Agency,* 218 F. Supp. 2d 1203 (C.D. Cal. 2002) .......... 30

*Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612 (7th Cir. 2007) .......... 16

*Elrod v. Burns*, 427 U.S. 347 (1976) .......... 32

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) .......... 26

*Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d. Cir. 2012) .......... 28, 30

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) 20

*Fulton v. City of Phila*, 593 U.S. 522 (2021) ........ 21

*Gad v. Northampton Cnty.*, No. 18-CV-3900, 2023 WL 2026630 (E.D. Pa. Feb. 15, 2023)....... 29

*Hope Rising Cmty. Church v. Municipality of Penn Hills*, No. CV 15-1165, 2015 WL 7720380 (W.D. Pa. Oct. 28, 2015)........ 14, 15, 21

*House of Fire v. Clifton Bd. of Adj.*, 379 N.J. Super. 526 (N.J. Super. Ct. App. Div. 2005) . 21, 34

*Hunt Valley Baptist Church, Inc. v. Baltimore County*, No. SAG-17-0804, 2020 WL 618662 (D. Md. Feb. 10, 2020) ........ 14

*Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320 (D.N.J. 2016) .... 20, 25

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013) ........ 12

*Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001)........ 33

*Lauderbaugh v. Hopewell Twp.*, 319 F.3d 568 (3d Cir. 2003) ........ 27

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3rd Cir. 2007) ........ passim

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ........ 33

*New Harvest Christian Fellowship v. City of Salinas*, 29 F.4th 596 (9th Cir. 2022) ........ 22

*Nken v. Holder*, 556 U.S. 418 (2009) ........ 34

*Nunez v. Wolf*, 117 F.4th 137 (3d Cir. 2024) ........ 26

*Opulent Life v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012) ........ 32, 33

*ReMed Recovery Care Ctrs. v. Twp. of Willistown,* 36 F. Supp. 2d 676 (E.D. Pa. 1999) ........ 35

*Riggs v. Long Beach Twp.*, 109 N.J. 601 (1988) ........ 16

*Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs,* 613 F.3d 1229 (10th Cir. 2010).... 16

*Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14 (2020)................................. 19, 26, 35

*Schrader v. Dist. Att'y of York Cnty*., 74 F.4th 120 (3d Cir. 2023)............................................. 34

*Smith v. City of Atl. City*, 138 F.4th 759 (3d Cir. 2025) ....................................................... 19, 23

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) .................................................................... 18

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144 (3d Cir. 2002) ....................... 20, 24

*Thai Meditation Ass'n of Alabama v. City of Mobile,* 980 F. 3d 821 (11th Cir. 2020) .......... 23, 32

*Tree of Life Christian Schs. v. City of Upper Arlington, Ohio*, 905 F.3d 357 (6th Cir. 2018) ..... 16

*United States v. Bensalem Twp.*, 220 F. Supp. 3d 615 (E.D. Pa. 2016) ...................................... 29

*Washington v. Klem*, 497 F.3d 272 (3d Cir. 2007) .............................................................. 22

*Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007) .... 22, 27, 28, 31

*Williams v. Sec'y Pennsylvania Dep't of Corr.,* 450 F. App'x 191 (3d Cir. 2011)........................ 28

*WR Prop. LLC v. Twp. of Jackson*, No. CV173226MASDEA, 2021 WL 1790642 (D.N.J. May 5, 2021)...................................................................................... 12, 35

*Zubik as Tr., Roman Cath. Diocese of Pittsburgh v. City of Pittsburgh*, No. CV 20-1809, 2025 WL 461533 (W.D. Pa. Feb. 11, 2025) ......................................................................... 26

**Statutes**

42 U.S.C. § 2000cc(b)(1)........................................................................................... 12

42 U.S.C. § 2000cc-5(7)(A)........................................................................................ 22

N.J.S.A. § 40:55D-10(g)(2) ........................................................................................ 8

**Ordinances**

Borough of Sayreville Code of Ordinances § 26-85(2)...................................................... passim

Borough of Sayreville Code of Ordinances § 26-88(2)(b) .................................................... 21

Borough of Sayreville Code of Ordinances § 26-88.1 ......................................................... 5

Borough of Sayreville Code of Ordinances Zoning Schedule I-A, Zoning Schedule I-B.... passim

## PRELIMINARY STATEMENT

Very few cases are black and white, leaving no room for argument or competing interpretations. The case of Masjid Sadar, however, presents one of those rare scenarios—a zoning ordinance that plainly and on its face treats houses of worship more harshly than secular institutional uses, an application to build a mosque that should have never been required in the first place, surrounded by animus and heightened scrutiny, and a clearly arbitrary denial that has left a Borough's Muslim population without a house of worship—renting makeshift facilities inadequate to meet even their most basic religious needs. For these reasons, as set forth more fully below, a preliminary injunction is justified, as (1) Plaintiffs' Free Exercise and RLUIPA claims are clearly likely to prevail, (2) the Plaintiffs' injury—the loss of their First Amendment freedoms—is manifest, (3) granting Plaintiffs' application to build a house of worship would serve the public interest, supporting an inherently beneficial religious use, and (4) such relief would in no way harm Defendants, who have failed to state *any* government interest—whether in the Planning Board's resolution or in its zoning code—in denying Plaintiffs' mosque.

## STATEMENT OF FACTS

### A. MSI and Its Mission

There are approximately 2,500 Muslims that live in and around the Borough of Sayreville, New Jersey ("Borough") but there is not a single mosque in Sayreville where Muslims can assemble and practice their faith. Declaration of Shameer Sadar dated May 20, 2026 ("SSD") ¶¶ 8, 14. For many practicing Muslims, going to *Jumu'ah* (Friday Prayer) at a mosque is obligatory for every man who has reached the age of puberty. Declaration of Nazeer Syed dated May 20, 2026 ("NSD") ¶ 41. Plaintiffs sincerely believe that congregational prayers in Islam are 27 times more virtuous than prayers alone, and a Muslim is rewarded for every step he takes on the way to the masjid. NSD ¶ 12. The nearest mosque to Sayreville is a 15 to 20 minute drive from the

Borough. Declaration of Aquil Mohammed dated May 20, 2026 ("AMD") ¶ 6; Declaration Mohammed Shaji Ahmed dated May 20, 2026 ("MSAD") ¶ 8; SSD ¶¶ 11-13.

Having a mosque in their community is as important to the Plaintiffs as a school or a hospital. Declaration of Mohammed Naveed dated May 20, 2026 ("MND") ¶ 9; Declaration of Samiullah Mirza Baig dated May 20, 2026 ("SMBD") ¶ 9. For many, traveling to another town to pray at a mosque is too far, making it difficult to practice their faith. SMBD ¶ 10. Masjid Sadar, Inc. ("MSI") opened in September 2021 on the property located at 214 Ernston Road, Parlin, New Jersey 08816 ("Subject Property"), providing a place of worship for Muslims in Sayreville, many of whom did not have a place where they could practice their faith locally. SMBD ¶¶ 7, 12; NSD ¶ 7; SSD ¶¶ 8, 19. MSI provided a place where Sayreville's Muslim women could feel safe to practice their faith, as well as an opportunity to connect and interact with other Muslim women their age. NSD ¶ 14; MND ¶¶ 17-19. MSI provided an opportunity for Muslim youth to connect, strengthen their sense of identity, and grow in their faith. SSD ¶ 36; NSD ¶ 17. MSI provided hundreds of Muslims with a sense of community and a place where they felt safe to practice their religion. SMBD ¶ 11; AMD ¶ 5; MSAD ¶¶ 9-10, 13, MND ¶ 8, 10.

In order to be considered a mosque, MSI's religious beliefs dictate: (a) a mosque facility must be a deeded property donated by the owner to God or owned and constructed by Muslims; (b) the prayer area must be specifically consecrated according to religious tenets; and (c) the sanctity of that prayer area must be maintained by adherence to certain religious practices. SSD ¶¶ 10, 18, 50. The prayer rooms of a mosque are oriented towards Mecca to ensure the congregation is facing Mecca while praying. SSD ¶ 18. MSI's religious beliefs require separate areas for men and women to pray and perform *Wudu*, a sacred purification ritual that must be performed before prayers. AMD ¶¶ 27-30; MSAD ¶ 25; NSD ¶ 42. Members of MSI believe that

it is a sacred duty to teach the Arabic language and the Quran to children from a young age to preserve the Quran and the blessings it contains. SSD ¶¶ 23-24.

On February 19, 2022, MSI filed an application with the Borough of Sayreville Zoning Board of Adjustment ("ZBA") for Conditional Use approval to build a mosque on the Subject Property ("ZBA Application"). Declaration of Matthew Sykes dated May 20, 2026 ("MSD") ¶ 13, **Exh. I**; ECF No. 12 ¶ 107; ECF No. 13 ¶ 107[1].

In June of 2023, after 15 months of revision and negotiation between MSI, the Borough and Middlesex County, Borough professionals determined the ZBA Application was fully compliant with conditional use requirements and recommended that MSI submit an application (the "PB Application") to the Borough of Sayreville Planning Board ("PB") instead of the ZBA. ECF No. 12 ¶¶ 175-76; ECF No. 13 ¶¶ 175-76; MSD ¶ 4, **Exh. B**. The PB Application sought to build a mosque featuring men's and women's prayer halls, classrooms for religious instruction and a space for youth programming. *Id.*

### B. Borough Interference and History of Anti-Muslim Animus

On December 6, 2022, ten months after Plaintiffs had filed the ZBA Application, and despite ongoing efforts by MSI to work with the Borough, the Borough filed a Complaint in the Superior Court of New Jersey, Middlesex County, against Shameer Properties to block MSI from exercising their religion on Subject Property. ECF No. 12 ¶¶ 136-38; ECF No. 13 ¶¶ 136-38.

While representatives of MSI worked on getting approval to build a mosque, members of MSI, who view building community and honoring one's neighbor as basic tenants of their faith, worked to benefit the community around them. AMD ¶ 12; SMBD ¶ 15. MSI conducted food drives, operated a soup kitchen, gave away turkeys at Thanksgiving and gave out gift bags around

[1] Each cite to the Amended Complaint (ECF No. 12) is accompanied by the corresponding cite to the Defendants' answer (ECF No. 13) admitting the alleged fact.

New Years. NSD ¶ 34; SMBD ¶ 16; MSAD ¶¶ 16, 17; AMD ¶ 15.

On or about February 7, 2023, after more than a year of working with the Borough to get permission to practice their faith in Sayreville, the State court issued an order preventing MSI from operating a house of worship on the Subject Property. ECF No. 12 ¶ 142; ECF No. 13 ¶ 142. MSI began meeting at St. Bernadette Church, before moving to a rented fire hall (the "Firehouse"). SSD ¶ 51; MSAD ¶ 21; NSD ¶ 37. Both locations were grossly inadequate for MSI's religious exercise. SMBD ¶¶ 23-24; MND ¶¶ 15-16; NSD ¶¶ 39-40;

### C. MSI's Current Facility and Its Religious Needs

The closing of MSI was heartbreaking for its members. AMD ¶ 20; NSD ¶ 36. Members felt embarrassed and felt that a fundamental right had been taken away from them. MND ¶ 14.

The Firehouse is small, with only one open room for prayer. AMD ¶ 31; SMBD ¶ 23. It is only available to MSI for Friday service and monthly Family night. NSD ¶ 46; SSD ¶ 46. The bathroom area is small, with a men's and women's room close together, not providing enough space for men and women to perform *Wudu* with only members of the same gender. AMD ¶¶ 27-30; MSAD ¶ 25; NSD ¶¶ 42-43. Many of MSI's female members have refrained from attending prayer due to not having a woman-only space in which to do so. AMD ¶¶ 32-33; SMBD ¶¶ 25-26; MSAD ¶¶ 23-24; NSD ¶ 45.

The Firehouse "does not provide time or space for MSI's religious classes," which has caused "many of [MSI's] youth [to] miss out on religious education." SSD ¶ 57; *see also* NSD ¶¶ 45, 50; SMBD ¶¶ 19-20. Most religious education programs for both children and adults stopped when MSI was enjoined from meeting on the Subject Property. MSAD ¶ 26. This has resulted in a precipitous decline in youth engagement and attendance which threatens the future of the faith in Sayreville. NSD ¶¶ 45, 50.

MSI's religious exercise is further burdened by the rental space at the Firehouse having neither a kitchen nor dining room to prepare and eat Ramadan meals (*Iftar*) causing MSI to cancel *Iftar* altogether. *See* SMBD ¶¶ 28-29; NSD ¶ 53 ("We do not have a place to break fast together or pray *Maghrib*, the prayer right before we break fast."); MSAD ¶ 27.

Despite efforts to benefit the community, Firehouse staff refuses to provide a long-term agreement, and regularly reminds Plaintiffs that they can revoke permission at any time if too many people attend prayer. SSD ¶ 54; MSD ¶ 6, **Exh. D**. As recently as February 2026, the police were called by neighbors who reported "3000 people" present at the Firehouse during prayer despite MSI having only 300 members. SSD ¶ 55; MSD ¶ 5, **Exh. C**, at 19.

### D. Planning Board Application, and Associated Community Animus and Opposition

On or about August 15, 2023, Plaintiffs filed the PB Application with the PB. MSD ¶ 4, **Exh. B.** The PB Application underwent multiple revisions, but the final plans presented to the PB were fully compliant with the Borough's Conditional Use standards and parking standards, providing 107 parking spaces, one for every three prayer mat spaces (321), consistent with Borough Code § 26-88.1, which governs off-street parking. *Id* ¶ 14, **Exh. J**.

The final PB Application requested five (5) variances for: (1) parking spaces located within the front yard setback, (2) signage within the front yard setback, (3) an accessory structure within 10 feet of the main building, (4) flat roofs in residential areas, and (5) the number of parking spaces. *Id.* ¶ 21, **Exh. O** at 12-14. Plaintiffs did not intend to request a variance for the number of parking spaces, as the PB Application was consistent with the Code. *Id.* ¶ 10, **Exh. H**, Tr. 49: 12-18. However, at the suggestion of the PB, the PB Application requested a variance for 143 parking spaces, above and beyond the 107 required by the Code, "for belt and suspenders" reasons. *Id.* at 50:16-23. The PB Application also requested "design waivers" for a loading area, a

deceleration lane, lawn with a slope of less than two (2%) percent, sidewalks between parking areas and principal structures, and curbing and planted islands within the parking area. *Id.* ¶ 21, **Exh. O** at 12-14.

The PB held seven hearings on the PB Application between April 2024 and May 2025. MSD ¶ 21, **Exh. O**, at 46-51. The hearings contained numerous procedural departures and inconsistencies.[2] After the initial hearing, each hearing on the PB Application was held at an alternative location. ECF No. 12 ¶ 227; ECF No. 13 ¶ 227.

The level of hostility from local residents that MSI experienced while operating on Subject Property only intensified during the PB hearings. MND ¶ 21. A nonexhaustive list of comments made by residents targeting MSI and its religion include:

1. "You've upset everybody from Sayreville to Old Bridge."
2. "We know when the Indians have their holidays they come from Edison, they come from all over…You know they're going to come from other towns on Ramadan. They're going to come from all over."
3. One resident asked if the crescent on the top of MSI would be visible from route 9 and a person in the audience shouted "yeah of course. I'll never see the sun again."
4. "We have 1,600 Muslims in the close vicinity... you can have 300 [congregants], right? A year later it's at 600. Who's accountable for that?... Are we going to put penalties and fines and fees on them every time somebody goes over 300?"
5. "How are we going to make them accountable for making it become a disaster? It might not be a disaster day 1, day 2; when things grow, fastest Muslim community, fastest religion growing; how are you going to tell me this community ain't going to grow?"

[2] Prior to the PB hearing any testimony on the PB Application, the Mayor of nearby Old Bridge Township issued a letter to the PB, in response to the "numerous" residents that have "voiced serious concerns" to the Old Bridge Town Council related to the PB Application. MSD ¶ 17 & **Exh. M**. The PB was responsive to this local community opposition. In the Fall of 2025, the Borough Council President circulated a letter stating the vote "to deny the application for a mosque development on Ernston Road . . . was made after listening to residents' concerns." *Id.* ¶ 18 & **Exh. N**.

6. “All of us who live in Sayreville know it's a disaster.”

7. "I pay taxes... If my property and lifestyle get ruined because there's services at 10:30, 11 o'clock at night... who do I complain to?” MSD ¶¶ 10, 15-16, **Exhs. H, K and L**.

Members of MSI who attended the meetings endured ridicule, slurs and resentment. AMD ¶ 46; MND ¶ 21. They even witnessed members in the community openly *crying* at the idea of a mosque being built in the Borough. MND ¶ 22.[3]

On April 8, 2025, notice was posted on the Facebook page for the Borough that there would be a hearing on MSI. SSD ¶ 71, **Exh. A**. Comments on that Facebook post include:

1. “Nothing creeps me out more than seeing a woman in a Burka.”

2. “No matter how they try to cover it, Muslims HATE All Jews AND Christians! Wake UP!!!

3. “if [sic] they have their way they WILL eliminate YOU & every Christian, Jew, etc. on this Planet! You’re [sic] apparently forgotten the 3000 Innocents People Murdered on 9/11.”

4. “You’re incapable of assimilating to any western country. You demonstrate that wherever you people go.”

5. “The caliphate is here. It has to stop. Read the Karan [sic]. They hate Christians and Jews.”

6. “They are not nice people. They think woman are beneath them and are very arrogant people. I say go build one in the middle of the desert.”

7. “Let’s think of all the Evil things Muslims have done to all Our people, Christians, Jewish people, remember 9/11? I believe it was Egypt, Lebanon, and Saudi Arabians, your people should stay where you came from because you are evil.”

8. “Do the [sic] NOT remember 9/11 and the Muslim neighborhoods thru out NJ CHEERING after it happened."

---

[3] Consistent with such hostility, neighbors took pictures and complained about how many cars were present during Friday service. SSD ¶ 48. When one inspector asked to inspect the prayer area at the Subject Property, he was asked to remove his shoes, as is customary in an Islamic prayer room. *Id.* ¶ 50. The inspector responded that if he removed his shoes and he tripped, he would own the whole property. *Id.*

9. "Another Jihad coordination center. Just swell. They already have Edison and are expanding."

10. "Isn't this still America? WE are just inviting them to take over."

11. "All and every Sayreville resident should got [sic] to the meetings and oppose any ideas of mosques in their town at all." SSD ¶ 71 & **Exh. A**.

The PB Application was denied by the PB on June 4, 2025. ECF No. 12 ¶ 4; ECF No. 13 ¶ 4.[4] Pursuant to N.J.S.A. § 40:55D-10(g)(2), the PB was required to adopt a memorializing resolution of its decision "not later than 45 days after" they "voted to deny the application." N.J.S.A. § 40:55D-10(g)(2). However, the PB did not adopt a memorializing resolution ("Resolution") was not held until December 3, 2025, nearly six (6) months after the PB's vote for denial of the PB Application. ECF No. 12 ¶ 336; ECF No. 13 ¶ 336.

The Resolution substantively addressed only one variance—the parking variance—and denied the entire PB Application based on a discriminative departure from the Code's parking standard. Specifically, rather than applying the 3-1 passenger to car ratio set forth in the Code, *see* MSD ¶ 3, Exh. A § 26-88.1, the PB reasoned that "testimony from the Applicant's representatives reflects that 1.6-1.8 congregants travel in each vehicle to the Friday Prayer Services, [which] is almost fifty percent less than the 3.0 per vehicle assumed by the Borough's ordinance." *Id.* ¶ 5, **Exh. C** at 36. The PB thus concluded that "if 321 individuals were to attend a Prayer Service"—filling the total prayer mat spaces provided—"there would be approximately just under 145 vehicles where only 107 parking spaces are required."[5] *Id.* In addition, although

[4] Plaintiffs submitted four (4) revisions to the plans in attempts to address the PB's purported concerns and agreed to no less than twenty four (24) conditions of approval. ECF No. 12 ¶ 293; ECF No. 13 ¶ 293.

[5] The PB's math is unclear, since 321 divided by 3 equals 107—the number of spaces provided by the PB Application—and 321 divided by 1.6 or 1.8, the PB's per car ratio applied to the PB Application, equals more than 145 vehicles, the amount PB apparently determined was required. The PB's basis for its calculation set forth in the resolution is simply unknown.

the PB recognized that far less than "321 individuals" attend MSI's Friday prayer services, as it only "currently ha[s] 270 attendees between its two Friday Prayer Services"—*i.e.*, about 135 attendees at each services—it seemingly denied the PB's application upon a projection of MSI's "5% growth over the next 5 years." *Id.* In the case of such growth, the PB cryptically determined that "if the Applicant wanted to have 321 prayer mats, it could still satisfy its parking obligations if it reduced the size of the ancillary uses." *Id.* Based on these erroneous standards, the PB concluded simply that "Applicant failed to proffer any evidence that demonstrated that it could design a mosque and related ancillary activities that would meet the Borough's parking standards." *Id.* at 36-37.

**E. The Borough Code's Facial Discrimination Against Houses of Worship**

Despite acknowledging in 2013 that its standards for religious uses are not "consistent with other institutional or quasi-public uses in the Borough," the Borough has failed to revise its Code to treat religious and comparable institutional uses equally. The 2013 Sayreville Borough Master Plan (the "Master Plan"), which is still in place today, highlights "LAND USE ISSUES" within the Borough and recognized the "need to create standards for religious institutions in accordance with the Religious Land Use and Institutionalized Persons Act (RLUIPA) of 2000." MSD ¶ 7, **Exh. E** at LU-2. More precisely, the Master Plan, after recognizing that the "Borough may not impose[] a land use regulation that imposes a substantial burden on the exercise of religion," specifically recommends:

> revising existing standards to better regulate their intensity, scale, building setbacks, parking requirements, appropriate buffers and other standards in the context of surrounding residential development within all residential districts in a manner that does not impose a substantial burden on the exercise of religion. Such revisions should regulate religious institutions in a similar fashion to other institutional type uses.

*Id.* at LU-13. It has failed to do so.

The Borough treats Houses of Worship more harshly than comparable "institutional type uses" in essentially every regulated area of land-use, including areas permitted, minimum lot area, minimum lot width, setback, and off street parking requirements. MSD ¶ 3, **Exh. A**, § 26-85(2) of the Code. First, Houses of Worship are only permitted in the Borough after obtaining a conditional use permit. *See id.* (noting Houses of Worship are only "permitted as a conditional use in all zoning districts"). By contrast, 15 of the Borough's 19 districts[6], including the R-7 District where MSI's proposed mosque is located, allow "Institutional and Public Uses" as of right. *Id.* Zoning Schedule I-A, Zoning Schedule I-B. In addition, Institutional and Public Uses, as compared to Houses of Worship, enjoy more lenient zoning requirements throughout the Borough. Within MSI's R-7 District, for example, (i) Houses of Worship are required to have a minimum lot of 1 acre, while Institutional and Public Uses are only required 7,500 square feet; (ii) Houses of Worship require a minimum lot width of 100 feet, while Institutional and Public Uses only require 75 feet; (iii) Houses of Worship require a minimum set back of 50 feet in the front and back, while Institutional and Public Uses require only 20 feet in the front and only 2 feet in the back; and (iv) Houses of Worship require a minimum side yard of 25 feet on each side, while Institutional and Public Uses only require 8 feet on each side. *Id.* Zoning Schedule II-A, Zoning Schedule II-B, Zoning Schedule III.

In multiple zoning districts throughout the Borough, nonreligious assemblies and institutions, such as nightclubs, health clubs and recreational facilities, child care centers, funeral homes, indoor theaters, nursing homes, continuing care retirement communities, and assisted living facilities may operate as of right, while Houses of Worship are only conditionally allowed. *Id.* Zoning Schedule I-A, Zoning Schedule I-B, § 26-85(2).

---

[6] Permitted by right in districts R-5, R-7, R-10, R-20, PD-7, PD-10, G-1, B-1, B-2, B-3, PO, MW, Prime, SED, & I; not permitted in districts, O-S-C, OS-R, SED-2, & GVB.

Despite these inequities recognized by the Borough roughly 13 years ago, and still reflected in its Master Plan, the Borough has failed to execute its Master Plan's "Recommendations" to "[r]evise requirements for religious uses to have standards that are consistent with other institutional or quasi-public uses in the Borough," leaving religious institutions like MSI to carry the burden. *Id.* ¶ 7, **Exh. E** at LU-14.

## PROCEDURAL HISTORY

Plaintiffs filed the underlying Complaint on November 21, 2025. ECF No. 1. Thereafter, Plaintiffs filed an Amended Complaint on January 27, 2026. ECF No. 12. Defendants filed their Answer on February 10, 2026. ECF No. 13. After a teleconference with the Court on December 17, 2025, the parties scheduled an in-person settlement conference on February 17, 2026, at which time counsel for Defendants indicated that there would be further consultation with the Borough and PB regarding a potential settlement. MSD ¶ 11. The soonest subsequent regular Borough Council meeting was scheduled for March 23, 2026. *Id.* ¶ 19. However, Defendants scheduled a special Borough Council meeting on March 9, 2026 (the "Special Council Meeting") to discuss the issue of settlement. *Id*. The Court conducted its Federal Rules of Civil Procedure 16 conference with the parties on April 29, 2026 (ECF No. 14), at which time Defendants advised that a settlement proposal would be forthcoming. *Id.* ¶ 20. To date, no settlement has been reached and Plaintiffs now file this Motion for Preliminary Injunction.

## STANDARD OF REVIEW

Plaintiffs are entitled to a preliminary injunction upon demonstrating (1) that they are reasonably likely to prevail eventually in the litigation; and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made, the District Court then considers, to the extent relevant, (3) whether an injunction would harm the defendants more than denying relief would harm the plaintiffs; and (4) whether granting relief would serve the public

interest. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013); *see also Al Falah Ctr. v. Twp. of Bridgewater*, No. CV 11-2397, 2013 WL 12322637, at *19 (D.N.J. Sept. 30, 2013) (enjoining enforcement of statute); *WR Prop. LLC v. Twp. of Jackson*, No. CV173226MASDEA, 2021 WL 1790642 (D.N.J. May 5, 2021) (enjoining enforcement of ordinance affecting construction of religious school).

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.

#### A. Plaintiffs Are Likely to Succeed on their RLUIPA Equal Terms and Free Exercise Claims Because the Borough's Zoning Code, on Its Face, Treats Places of Worship on Less than Equal Terms as Nonreligious Assembly and Institutional Land Uses.

##### 1. RLUIPA Equal Terms.

Plaintiffs are highly likely to succeed on their Equal Terms claim, 42 U.S.C. § 2000cc(b)(1), because the Code,[7] which *inter alia* requires Houses of Worship to seek a conditional use permit while permitting other "Institutional and Public Uses" by right, treats religious and non-religious assemblies and institutions unequally. In fact, as described below, the Borough's Code *explicitly excludes* houses of worship from its definition of preferentially treated "Institutional and Public Uses" land use category. MSD ¶ 3, **Exh. A**, § 26-6. Indeed, if Houses of Worship were permitted by right like nonreligious assembly and institutional land uses, then they would be spared the conditional use process altogether, and houses of worship—like MSI—would not be subject to the lengthy, discretionary and costly approval process described herein, nor subject to denial of their applications due to subjective and ad hoc standards.

[7] See MSD ¶ 3, **Exh. A**, § 26-85(b)(2); Zoning Schedule III Bulk Regulations-Houses of Worship; Zoning Schedule I-A Use Regulations - Residential Districts; Zoning Schedule II-A Bulk Regulations - Residential Districts.

A plaintiff succeeds under RLUIPA's Equal Terms Provision where it "show[s] (1) it is a religious assembly or institution, (2) subject to a land use regulation, which regulation (3) treats the religious assembly on less than equal terms with (4) a nonreligious assembly or institution (5) that causes no lesser harm to the interests the regulation seeks to advance." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 270 (3rd Cir. 2007) ("*Lighthouse*"). In the Third Circuit, "RLUIPA's Equal Terms provision operates on a strict liability standard." *Lighthouse*, 510 F.3d at 269.

A plaintiff is not required to identify an identical use. The Third Circuit explained that a plaintiff need not show a better-treated secular comparator that "proposes the same combination of uses." *See id.* at 264. Nor is a plaintiff required to identify an actual existing nonreligious assembly or institution, where disparate treatment is evident on the face of the zoning code. *See, e.g., Hunt Valley Baptist Church, Inc. v. Baltimore County*, No. SAG-17-0804, 2020 WL 618662 at *13 (D. Md. Feb. 10, 2020) ("[T]he Third Circuit's . . . [Equal Terms] test does not require a RLUIPA plaintiff 'to show that there exists a secular comparator that performs the same functions.'" (quoting *Lighthouse*, 510 F.3d at 266)); *Hope Rising Cmty. Church v. Municipality of Penn Hills*, No. CV 15-1165, 2015 WL 7720380, at *5 (W.D. Pa. Oct. 28, 2015) (recommending preliminary injunction on Equal Terms when ordinance allowed parks, playgrounds, and educational institutions, but permitted houses of worship only as a "conditional use").

Here, there is no dispute that MSI, as a mosque, is a "religious assembly or institution" subject to the Borough's "land use regulation," which requires MSI to apply for a conditional use permit to operate, satisfying the first two elements. *Lighthouse*, 510 F.3d at 270. In addition, Plaintiffs succeed under the third, fourth and fifth elements of the *Lighthouse* test because the Code on its face treats Houses of Worship "on less than equal terms" as nonreligious institutions and/or

assemblies that have been widely held to be comparable uses, having the same impact on any interests the Code may seek. *Id.* The Code does not include any specific land-use goals for the R-7 District. MSD ¶ 3, **Exh. A** § 26-2. However, Institutional and Public Uses—defined as including "public and private schools, libraries . . . [and even] structures or land used for public purposes," *id.* § 26-6, and permitted in the R-7 District as of right, are comparable uses to Houses of Worship like a mosque, having the same impact on regulatory objectives.

This differential treatment is made more evident by the Code's definition of its preferred "Institutional and Public Uses" land use category, which explicitly excludes houses of worship:

> Institutional and public uses means non-profit public or quasi-public institutions and uses, such as public and private schools, libraries and municipally-owned or operated buildings, structures or land used for public purposes, <u>not including houses of worship</u>.

*Id.* (emphasis added). This is blatant discrimination. *See Lighthouse*, 510 F.3d at 272-73 (holding that a place of worship would not "cause greater harm to regulatory objectives than [institutional or public uses] that could be used for unspecified meetings"); *see also Hope Rising Cmty. Church*, 2015 WL 7720380, at *5 (finding that parks, playgrounds, and educational institutions are comparable to houses of worship); *Al Falah Ctr. v. Twp. of Bridgewater*, 2013 WL 12322637, at *15 (granting plaintiff's motion for preliminary injunction where township had not demonstrated the ordinance treated religious assemblies on "equal terms with a secular assembly that would cause an equivalent negative impact" (citing *Lighthouse*)). In fact, land used for public purposes—permitted in the R-7 District—"allow some of the most important forms of civil assembly," and are not unlike Houses of Worship. *Lighthouse*, 510 F.3d at 276. *See also Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 614–15 (7th Cir. 2007) (finding auditoriums, community centers, senior citizens' centers, day-care centers, nursing homes, and funeral homes to all be appropriate comparators); *Tree of Life Christian Schs. v. City of Upper Arlington, Ohio*, 905 F.3d

357, 373 (6th Cir. 2018) (daycares); *Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs,* 613 F.3d 1229, 1236 (10th Cir. 2010) (schools).

Additionally, the Borough's Master Plan recognizes that "religious institutions" and "other institutional type uses" should be "regulate[d] . . . in a similar fashion." MSD ¶ 7, **Exh. E** at LU-13. Thus, permitting MSI's house of worship in the R-7 District not only does not detract from any regulatory purposes—as there is none for the R-7 District—but it actually advances the Borough's instruction, as stated in the Master Plan, of providing "requirements for religious uses to have standards that are consistent with other institutional or quasi-public uses in the Borough." *Id.* at LU-14. *See Riggs v. Long Beach Twp.*, 109 N.J. 601, 611 (1988) (implementation of a valid zoning code or ordinance must be "substantially consistent with the land use plan element and the housing plan element of the master plan" (citation omitted)).

The Code is a model violation of RLUIPA's Equal Terms provision. It has created two categories of institutional and assembly uses: one, religious ("Houses of Worship"), and the other, nonreligious ("Institutional and Public Uses"). MSD ¶ 3, **Exh. A**, Zoning Schedule I-A, I-B, I-C. It permits the former by right in all Residential, Commercial, and Industrial zoning districts, and requires a conditional use permit for the latter in all of those same districts. *Id.* The Code thus on its face singles out houses of worship as the only institutional type of use required to obtain a conditional use permit to operate *anywhere* within the Borough, not only within the R-7 District, *id.* § 26-85(b)(2) (stating that houses of worship are permitted only as a conditional use "in all zoning districts").

Such unequal treatment is exacerbated by the Borough's requirement that Houses of Worship meet more stringent bulk use standards than nonreligious Institutional and Public Uses in all 15 districts where Institutional and Public Uses are permitted as of right, to wit:

- Minimum lot area in all but one zoning district: Houses of Worship–1 acre, Institutional and Public Uses–7,500 square feet in residential areas and 10,000 square feet in business districts. MSD ¶ 3, **Exh. A**, Zoning Schedule II-A, Zoning Schedule II-B, Zoning Schedule III.

- Minimum rear yard setback in all but 2 districts: Houses of Worship–50 feet, Institutional and Public Uses–2 feet in residential zones. *Id.*

- Minimum side yard setback: Houses of Worship–25 feet per side, Institutional and Public Uses–8 feet per side. *Id.*

- Minimum front yard setback: Houses of Worship–50 feet, Institutional and Public Uses–20 feet. *Id.*

Thus, the Code, as it relates to the R-7 District where MSI is located, and also in all Residential, Commercial, and Industrial zoning districts, treats Houses of Worship on less than equal terms because it significantly regulates and/or restricts Houses of Worship while either failing to regulate or drastically relaxing regulation of Institutional and Public Uses. *See Bais Brucha Inc. v. Twp. of Toms River, New Jersey*, No. CV213239ZNQRLS, 2024 WL 863698, at *10 (D.N.J. Feb. 29, 2024) (holding that the "Land Use Regulations [that] require greater lot size requirements and larger lot width requirements for places of worship . . . while requiring a significantly smaller minimum lot area (or none at all) for nonreligious assembly and institutional uses" violated Equal Terms).

2. First Amendment, Free Exercise Clause.

MSI is similarly very likely to succeed on the merits of its Free Exercise Claim because the Borough's Zoning Ordinance treats comparable secular uses more favorably than religious uses, thus triggering strict scrutiny. MSD ¶ 3, **Exh. A**, Code § 26-85(b)(2), Zoning Schedules I-A, I-B, I-C. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (citation omitted, emphasis in original). "[W]hether two activities are comparable for purposes of

the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* For example, where state regulations treated secular activities like "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants" more favorably than "religious exercise at home"–despite posing the same threat to the government's interest of restricting the spread of COVID-19–the Supreme Court found the regulations non-neutral. *Id.* at 1297; *see also Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 17 (2020).

The differential treatment of the Code's "Use" and "Bulk" regulations between religious and nonreligious institutional and assembly uses is subject to strict scrutiny review under the Free Exercise Clause (unlike RLUIPA, which is a strict liability provision, *see supra*) because they favor several secular activities that are similarly situated to Houses of Worship. MSD ¶ 3, **Exh. A** Zoning Schedules I to III. As noted above, Zoning Schedule I permits Institutional and Public Uses by right, while requiring Houses of Worship to apply for a conditional use permit and imposing more stringent bulk regulations, subjecting religious use to clearly differential treatment. *Id.* § 26-85(b)(2). Thus, viewed alongside the Code's failure to state a specific goal related to the R-7 District, it is clear that MSI's House of Worship would not detract from any legitimate government interest–much less a "compelling" one–as compared to "Institutional and Public Uses." *Id.*; *cf. Lighthouse*, 510 F.3d at 265 (striking down an ordinance "because both behaviors impacted the city's declared goals in the same way."); *see also Smith v. City of Atl. City*, 138 F.4th 759, 778 (3d Cir. 2025) (For "the free-exercise inquiry, we identify comparators according to their impact on the City's asserted interest"); *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 347 (D.N.J. 2016) (determining comparators based on their "impact the city's declared goals" (citations omitted)).

Thus, the Code is subject to strict scrutiny because it significantly regulates and/or restricts Houses of Worship while either failing to regulate or drastically relaxing regulation of secular conduct that has an equal land-use impact. *See Islamic Soc'y of Basking Ridge*, 226 F. Supp. 3d at 351 (finding a similar parking scheme "appropriate for consideration in a strict scrutiny analysis"); *see also Lighthouse,* 510 F.3d at 275 ("A law is not generally applicable when it proscribes particular conduct only or primarily when religiously motivated.'" (citations omitted)); *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365-366 (3d Cir. 1999) (strict scrutiny of beard policy's discriminative exemptions).

The challenged Code regulations cannot survive a strict scrutiny analysis under the Free Exercise clause unless Defendants can demonstrate that the challenged law is narrowly tailored to advance a compelling government interest. *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 165 (3d Cir. 2002)*. Defendants can neither show that the challenged regulations nor denial of the PB Application is narrowly tailored to advance a compelling government interest. *See Fulton v. City of Phila*, 593 U.S. 522, 541 (2021) ("A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests" (citation omitted)). Specifically, there can be no meaningful government interest in differential treatment of Institutional and Public Uses and Houses of Worship, as they are comparable uses with respect to land-use. *See, e.g.*, *Hope Rising Cmty. Church*, 2015 WL 7720380, at *5; *Al Falah Ctr.*, 2013 WL 12322637, at *15. Moreover, Defendants cannot meet strict scrutiny as to the individualized denial of the PB Application because (i) the application complied with the Code's 3:1 parking ratio, providing 107 parking spaces for a capacity of 321 seats and therefore satisfying the Borough's interest in maintaining its legislated parking standard, MSD ¶ 5, **Exh. C** at 5; ¶ 10, **Exh. H** Tr. 22:1-6; and (ii) MSI has agreed to comply with all of the

PB's 24 conditions of approval of the PB Application, satisfying any further interest involved in the PB's individualized assessment of the PB Application. *Id.* at 37-39. Defendants' satisfaction of strict scrutiny is further undercut by the fact that New Jersey recognizes Houses of Worship as an inherently beneficial use (*see House of Fire v. Clifton Bd. of Adj.*, 379 N.J. Super. 526, 535 (N.J. Super. Ct. App. Div. 2005)) and there is no indication that Defendants' regulations or denial of the PB Application are supported by a competing, more important concern.

B. Plaintiffs Are Likely to Succeed on their RLUIPA Substantial Burdens and Free Exercise Claims Because the Planning Board's Denial Burdens Their Religious Exercise.

*1. Standard – RLUIPA's "Substantial Burdens" Provision.*

The Third Circuit has held that "a substantial burden exists where . . . the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007). While the Third Circuit has not established a more specific standard under RLUIPA, most federal circuits have adopted a "totality of the circumstances" approach to the Substantial Burdens analysis. In *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 348-53 (2d Cir. 2007), the Second Circuit applied a range of factors to decide that a Village's denial of a permit to allow a Jewish day school to expand constituted a substantial burden on the plaintiff's religious exercise. In doing so, the Court considered that the facilities were no longer adequate to attract and retain students, *id.* at 345, 349; that there were "no quick, reliable, or economically feasible alternatives," *id.* at 352; that the denial was a final denial, as opposed to a conditional denial requesting that the applicant make adjustments, *id.* at 349; that there was a "close nexus between the coerced or impeded conduct and the institution's religious exercise," *id.*; and, that the government decision makers acted in an "'arbitrary and capricious'" manner in their evaluation of the state's interests. *Id.* at 351 (citation omitted); *see also New Harvest Christian Fellowship v. City of Salinas*, 29 F.4th 596, 602 (9th Cir.

2022) ("[O]ur approach to … substantial burden is to look at the totality of the circumstances."); *Thai Meditation Ass'n of Alabama v. City of Mobile,* 980 F. 3d 821, 831 (11th Cir. 2020) (laying out a multi-factor test to determine if denial of the "plaintiffs' . . . applications was "akin to significant pressure which directly coerce[d] the [plaintiffs] to conform [their] behavior" (citations omitted)). As set forth below, every single one of these factors favors the Plaintiffs here.

*2. Standard – First Amendment's Free Exercise Clause.*

Beyond Plaintiffs' facial Free Exercise claim discussed *supra*, Defendants' denial of the PB Application is also subject to strict scrutiny under the Free Exercise Clause—making Plaintiffs' related Free Exercise Claim likely to succeed for a separate and independent reason—because the denial burdened[8] Plaintiffs' religious exercise in a system of individualized government assessments. "The Free Exercise Clause . . . extends beyond facial discrimination," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993), and "[e]ven a neutral law will fail general applicability, and thus fall within the Free Exercise Clause, if it 'invite[s]' the government to consider the particular reasons for a person's conduct.'" *Smith*, 138 F.4th at 770 (citation omitted). In particular, a "law must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (citation omitted). "[I]n situations where government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons

[8] Unlike RLUIPA, there is no requirement to show that a burden is "substantial" with respect to Plaintiffs' Free Exercise claim; any burden suffices. *See Brown v. Borough of Mahaffey*, 35 F.3d 846, 849-50 (3d Cir. 1994) ("Applying such a burden test to non-neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment.").

underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct." *Tenafly*, 309 F.3d at 165–66 (3d Cir. 2002) (citing *Lukumi*, 508 U.S. at 537).

Here, the PB's denial of the PB Application constitutes an individualized government assessment subject to strict scrutiny under the Free Exercise Clause because the PB—based on an subjective assessment of MSI's parking patterns and future growth—departed from the Code's fixed standards and engaged in a highly discretionary analysis. The PB denied the PB Application based on a subjective evaluation of MSI's parking patterns, driven by its mistaken determination that "[t]he ordinance does allow the borough to go through and provide alternate standards for parking if we feel what's there is not appropriate." MSD ¶ 9, **Exh. G**, Tr. 111:4-6[9] (emphasis added); ¶ 5 **Exh. C** at 24, 32 (noting PB's finding that the testimony and evidence "demonstrates a more intensive need for the applicant than the 1-to-3 parking space ratio required under our ordinance"). Thus, instead of applying Parking Schedule I's 1:3 ratio, which MSI indisputably meets, the PB reasoned that "1.6-1.8 congregants travel in each vehicle to the Friday Prayer Services, [which] is almost fifty percent less than the 3.0 per vehicle assured by the Borough's ordinance." *Id.* at 36. Following this reasoning, the PB found—although not quite coherently—that "the effect of this is that if 321 individuals were to attend a Prayer Services[,] there would be approximately just under 145 vehicles where only 107 parking spaces are required." *Id.* (emphasis added). The PB acknowledged what was required, yet mandated additional parking spaces (then denied a variance from such unsupported mandate) regardless.

[9] In the case of "Residential Uses", not Houses of Worship, the Code states: "Alternative parking standards to those shown in the schedule below shall be accepted if the applicant demonstrates these standards better reflect local conditions." MSD ¶ 3, **Exh. A**, § 26-88(2)(b). This Section is not applicable to the PB Application.

Further, the PB further rested its decision on an assessment that MSI might "want[] to have 321 prayer mats" if it "recognized 5% growth over the next 5 years." *Id.* Nowhere does the Code allow the PB to engage in such additional conjecture. Such analyses are the epitome of "an impermissible individualized inquiry," deserving strict scrutiny. *Islamic Soc'y of Basking Ridge*, 226 F. Supp. 3d at 349 (holding application of a different parking standard based on "an impermissible individualized inquiry" warrants the "highest protection of the Free Exercise Clause"); *see also Church of Hills of Twp. of Bedminster v. Twp. of Bedminster*, No. CIV. 05-3332 (SRC), 2006 WL 462674, at *4 (D.N.J. Feb. 24, 2006) (holding that the denial of the church's conditional use application required strict scrutiny).

*3. Building and using the mosque for worship purposes is religious exercise.*

MSI's construction and use of a mosque unquestionably constitutes religious exercise. The Free Exercise Clause protects "the performance of . . . physical acts" that constitute the free "exercise of religion," including "assembling with others for a worship service." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990); *see also Roman Cath. Diocese,* 592 U.S. at 19. RLUIPA further defines religious exercise as "<u>any</u> exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Nunez v. Wolf*, 117 F.4th 137, 146 (3d Cir. 2024) (emphasis added) (quoting 42 U.S.C. § 2000cc-5(7)(A)). Additionally, "[t]he use, building, or conversion of real property for the purpose of religious exercise" is considered to be religious exercise under RLUIPA. *Lighthouse*, 510 F.3d at 273; *see also Congregation Kollel, Inc. v. Twp. of Howell, N.J.*, No. CV 16-2457 (FLW), 2017 WL 637689, at *10 (D.N.J. Feb. 16, 2017) (erection of a "*yeshiva gedola* and *mesivta* on" property); *Zubik as Tr., Roman Cath. Diocese of Pittsburgh v. City of Pittsburgh*, No. CV 20-1809, 2025 WL 461533, at *18 (W.D. Pa. Feb. 11, 2025) (building of church).

Here, because MSI proposed to construct a mosque for, *inter alia*, Friday afternoon prayer service, Sunday school, and regular prayers, there is no dispute that MSI's PB Application constituted religious exercise. NSD ¶¶ 23, 29; MND ¶¶ 10, 13, 18; MSAD ¶¶ 10-11, 19-21; AMD ¶¶ 5, 9-11, 48; SMBD ¶ 30.

*4. Denial of the PB substantially burdens Plaintiffs' religious exercise.*

Defendants' denial of the PB Application is subject to strict scrutiny under RLUIPA's Substantial Burden provision—making MSI's Substantial Burden claim likely to succeed—because the denial substantially burdens Plaintiffs' religious exercise. (As discussed above, the burden need not be "substantial" under the Free Exercise Clause.) Defendants' denial of the PB Application substantially burdened Plaintiffs' religious exercise because it was not only absolute but also because it had a direct nexus with MSI's religious exercise. First, this is not a case where the "institution" had "a reasonable opportunity . . . to submit a modified application" or "file a second application that remedies the problems in the first," *Westchester Day Sch.*, 504 F.3d at 349, as Defendants' denial was final, absolute, and non-conditional. *See* MSD ¶ 5 & **Exh. C** at 38 ("[The] Resolution memorializes the denial of the application heard and acted upon by the Board."); *see also Congregation Kollel*, 2017 WL 637689, at *10 (holding Board decision final because the Board held hearings, "heard testimony" and "considered substantial evidence and came to its conclusion"); *Lauderbaugh v. Hopewell Twp.*, 319 F.3d 568, 574 (3d Cir. 2003) (holding administrative body's decision final where it "final, definitive appl[ied] the regulations at issue to the particular land in question").

Indeed, the PB "could have approved the application subject to conditions," *Westchester Day Sch.*, 504 F.3d at 352, as MSI agreed to and was ready to satisfy the PB's 24 proposed conditions of approval. MSD ¶ 5 & **Exh. C** at 28-29. Yet the PB "chose instead to deny the

application in its entirety," 504 F.3d at 352, and therefore "'directly coerce[d] the religious institution to change its behavior'" and remain in an inadequate rental facility, as set forth below. *Fortress Bible Church v. Feiner, 694 F.3d 208, 219-20 (2d. Cir. 2012)* (citation omitted); *see also Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 558 (4th Cir. 2013) ("[W]e find it significant that the County has completely prevented Bethel from building any church on its property, rather than simply imposing limitations on a new building.").

Moreover, there is a "close nexus" between Defendants' denial and MSI's religious exercise—supporting a likely win on the merits of MSI's Substantial Burden claim—because the PB's denial prevents Plaintiffs from worshiping in an adequate facility and forces them to continue services at the Firehouse. However, that rented venue is "wholly inadequate to accommodate its religious practice." *Fortress Bible Church*, 694 F.3d at 219-20. Most importantly, it is inadequate for daily congregational prayers, which is Islam's second pillar. *Cf. Williams v. Sec'y Pennsylvania Dep't of Corr.,* 450 F. App'x 191, 195-196 (3d Cir. 2011) (holding that plaintiff's religious exercise was substantially burdened by not having adequate location to perform his daily prayers). Even for Friday service, the Firehouse "does not have a separate area for women to attend, which is a requirement in Islam" and most women members do not come to Friday prayer anymore. MSAD ¶¶ 23-24; MND ¶¶ 18-19; AMD ¶¶ 32-33; NSD ¶ 44.

Regarding *Wudu*—the ritual washing before prayer and requirement for its validity—the Firehouse similarly does not provide adequate facilities for MSI's families, as the two bathrooms offer only one sink for men and women, respectively, and force mixing of men and women waiting for the bathrooms. *See* SMBD ¶ 24; NSD ¶¶ 42-43 (noting difficulty of *Wudu* at Firehouse); AMD ¶ 30 (same); *see United States v. Bensalem Twp.*, 220 F. Supp. 3d 615, 618 (E.D. Pa. 2016) (potential for substantial burden where facility did "not adequately permit the separation of the

sexes during worship"); *cf. Gad v. Northampton Cnty.*, No. 18-CV-3900, 2023 WL 2026630, at *9 (E.D. Pa. Feb. 15, 2023) (failure to provide an area for *Wudu* "substantially burdened his ability to practice his religion because he could not pray five times per day as required").

Beyond daily and Friday prayers, the Firehouse is inadequate for MSI's various religious programs and fundraising. Because the Firehouse only provides rental space for Friday service and family night once a month, all MSI's "educational programs and activities at the Masjid have stopped, including the youth groups," (NSD ¶ 45; SMBD ¶ 20) which has caused "many of [MSI's] youth [to] miss out on religious education." SSD ¶ 57. Put differently, "the school could not have met its needs simply by reallocating space within its existing buildings." *Westchester Day Sch.*, 504 F.3d at 352. The Firehouse likewise forces MSI to forego its extensive religious programs and offerings. NSD ¶ 14-35 (weekly youth groups, motivational lectures, hunger relief initiatives, weddings and funerals, among other programs); SMBD ¶¶ 17-18, MSAD ¶¶ 17, 20; SSD ¶ 39 (visiting religious speakers); *see Cottonwood Christian Ctr v. Cypress Redevelopment Agency, 218 F. Supp. 2d 1203, 1222 n.9 (C.D. Cal. 2002)* (substantial burden may exist where the "physical constraints of its current facility also limit [plaintiffs'] ability to conduct many of its different programs," such as "youth conferences"); *Fortress Bible Church*, 734 F. Supp. 2d at 504 (finding substantial burden where the facility impeded "the Church's ability . . . to host visiting missionaries"); *see also Chabad Lubavitch of Litchfield Cty., Inc. v. Borough of Litchfield, No. 3:09-CV-1419 (JCH), 2016 WL 370696, at *20 (D. Conn. Jan. 27, 2016)* (finding substantial burden where sanctuary was inadequate "as a meeting hall for meals, after services and on holidays"); NSD ¶ 26 ("[T]he Masjid's activities were crucial for a lot of members like myself to be able to continue practicing our faith."); SS ¶¶ 36-38 (same).

MSI is forced to "to rent space at other locations in order to create enough room for it to engage in . . . holiday services." *Chabad,* 2016 WL 370696 at *18; *see* SSD ¶¶ 65-68 (noting that "MSI is forced to rent . . . [a] school cafeteria during Ramadan to pray *Taraweeh*" and describing the hardships involved, including an hour for the daily setup and breakdown of the facility, and uncertainty regarding the space's availability); AMD ¶¶ 38-43 (noting limitations in praying *Taraweeh* at the school). Regarding *Iftar*–where MSI's members gather to break their daily fast–there is no dispute that "these meals are part of [MSI's] religious exercise," and thus pose a substantial burden where Defendants coerced MSI to remain in a "space . . . not [able] to accommodate . . . meals." *Chabad*, 2017 WL 5015624, at *20. Moreover, because MSI's masjid proposed by the PB Application "would have been sufficient to accommodate all of MSI's religious holiday observance and activities," SSD ¶ 69; AMD ¶¶ 15-16, 48, "it is undisputed that a [mosque] the size of the [Subject Property] is needed now for [Islamic] Holidays," and that MSI was substantially burdened by a "smaller [facility] unable to accommodate [its] congregants." *Chabad*, 2017 WL 5015624, at *21.

Beyond these burdens, MSI had no "quick, reliable, and financially feasible alternatives" to its current space at the Firehouse. *See Westchester Day Sch.*, 504 F.3d at 352. Indeed, after the closing of MSI's Initial Masjid, MSI also nearly lost access to the Firehouse—with all its inadequacies as far as MSI's religious observance—because of "complaints from neighbors worried about having a Muslim religious service nearby," causing the Firehouse to retract its initial offer to enter a written lease with MSI and instead offer only a verbal month-to-month agreement to allow MSI's Friday services, which can be cancelled at any time. SSD ¶ 53; MSD ¶ 5, **Exh. C**. MSI's rental space for *Taraweeh* prayers is likewise uncertain, requiring it to submit and win a yearly bid. SSD ¶ 68.

See section I(B)(1), *infra*, regarding the arbitrary and capricious nature of the Borough's action, which also supports a finding of substantial burden. Whether the PB's "decision making process concerning the plaintiffs' applications reflects any arbitrariness" might be demonstrated by a showing of "animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around." *Thai Meditation*, 980 F.3d at 832.

5. *Defendants' denial cannot survive strict scrutiny review*

For the reasons stated in Section I(A)(2), *supra*, Plaintiffs are likely to succeed on the merits of their Free Exercise claim because Defendants cannot meet strict scrutiny in connection therewith.

## II. MSI WILL SUFFER IRREPARABLE HARM WITHOUT RELIEF.

MSI will suffer irreparable harm if not granted a preliminary injunction because it will continue to suffer the complete loss of a facility to perform its mandatory religious observance. First, "the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). An "alleged deprivation of constitutional rights is tantamount to irreparable harm in the RLUIPA context 'because RLUIPA enforces First Amendment freedoms' and must be construed 'broadly to protect religious exercise.'" *Al Falah Ctr.*, 2013 WL 12322637, at *19 (citing *Opulent Life v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012)).

As such, when "religious liberty is directly threatened by the government's edict," it creates "the prospect of grievous harm, and the threshold for showing a likelihood of success on the merits may be correspondingly relaxed." *Conestoga Wood Specialities Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs., No. 13-1144, 2013 WL 1277419, at *7 (3d Cir. Feb. 8, 2013)*; *see also Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (finding that by demonstrating that a government

policy "places an unconstitutional burden on the [plaintiffs'] rights to the free exercise of their religion" plaintiffs "have therefore shown that they are likely to succeed in their free exercise claims" and "have likewise shown entitlement to a preliminary injunction").

The harm caused by the Defendants' application of the challenged Code regulations is immediate and severe. As a direct result of Defendants' laws and actions, MSI was forced to shutter its masjid, educational programs and other religious activities, and prevented from using its building for the same. *See, e.g.*, SS ¶ 47; *supra* Section I(B)(1). The current, ongoing harm to the Plaintiffs, as described above, is irreparable. *Opulent Life*, 697 F.3d at 295 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" (citation omitted)); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("[C]ourts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of" religious freedom).

## III. AN INJUNCTION WILL NOT HARM DEFENDANTS AND WILL SERVE THE PUBLIC INTEREST.

When a municipality is the opposing party, the final two factors of the preliminary injunction analysis merge and are assessed together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("[A]ssessing the harm to the opposing party and weighing the public interest . . . factors merge when the Government is the opposing party"); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) (same).

Here, there will be no harm whatsoever to Defendants. MSI has agreed to comply with all the PB's 24 conditions of approval of its Application, MSD ¶ 5, **Exh. C**, at 37-39, and is within Defendants' 3:1 parking ratio—providing 107 parking spaces for a capacity of 321 seats. *See id.* ¶ 10, **Exh. H,** Tr. 22:1-6. In addition, because New Jersey recognizes houses of worship as an inherently beneficial use that promotes the general welfare, *see House of Fire*, 379 N.J. Super. at

535, as a matter of law the public interest would be served by MSI's continued operation, including the Borough's Muslim population. *See, e.g.*, SS ¶ 8 (noting a "need for a place for Muslims to pray and practice their religion in this community"); NS ¶ 60 ("The majority of Masjid Sadar's members are from Sayreville, and a new masjid is needed for members to practice the bare minimums of their faith, like observing the daily prayer in congregation . . . .").

Moreover, courts have long recognized that it is in the public interest to protect against violations of constitutional freedoms, especially First Amendment rights. "The public interest in the protection and enforcement of civil rights and anti-discrimination laws generally weighs in favor of granting injunctive relief against violations." *ReMed Recovery Care Ctrs. v. Twp. of Willistown,* 36 F. Supp. 2d 676, 688 (E.D. Pa. 1999); *see also Cuomo*, 592 U.S. at 19 ("[I]t has not been shown that granting the applications will harm the public."). The Third Circuit has recognized that "[a]s a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable harm, it almost always will be the case that the public interest will favor the plaintiff." *WR Prop. LLC*, 2021 WL 1790642, at *13 (quoting *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

## CONCLUSION

For the foregoing reasons, Plaintiffs move this Court, for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking preliminary orders as follows:

1. Enjoining the Defendants, Borough of Sayreville, New Jersey ("Borough"), and Borough of Sayreville, New Jersey Planning Board ("PB"), and their officials and employees from enforcing or implementing the Borough Zoning Code's requirement of a conditional use permit against the Plaintiffs' proposed use of the Property located at 212, 214 and 216 Ernston Road, Parlin, New Jersey 08816 and designated on the tax map of the Borough of Sayreville as Block 444.04 Lots 23, 24, 25 and 28, as a mosque;

2. Compelling the Defendants, Borough of Sayreville, New Jersey, and Borough of Sayreville, New Jersey Planning Board, and their officials and employees to treat the Plaintiffs' proposed mosque as a permitted use on the Property; and

3. Compelling the issuance of a zoning permit by the Borough to the Plaintiffs for the Plaintiffs' proposed use of the Property located at 212, 214 and 216 Ernston Road, Parlin, New Jersey 08816 and designated on the tax map of the Borough of Sayreville as Block 444.04, Lots 23, 24, 25 and 28 as a mosque.

Dated: May 20, 2026

**STORZER & ASSOCIATES, P.C.**

/s/ Sieglinde K. Rath
Sieglinde K. Rath (#048131991)
Matthew D. Sykes (#030912011)
4400 Route 9 South, Suite 1000
Freehold, NJ 07728
rath@storzerlaw.com
sykes@storzerlaw.com
Tel: (410) 559-6325
Fax: (202) 315-3996
*Attorneys for Plaintiffs*

**LAWRENCE SACHS LLC**

/s/ Lawrence Sachs
Lawrence Sachs Esq. (#017701983)
8 Auer Court, Suite G
East Brunswick, NJ 08816
larry@sachslawnj.com
Tel: (732) 613-1441
*Attorneys for Plaintiffs*